Panel rehearing granted -- only for purpose
of designating opinion as published --
by order filed 12/15/00.

Filed:  December 15, 2000

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

No. 99-1318
(CA-97-435-2, CA-97-1207-2)

---

Kathryn Riddick, etc., et al.,

Plaintiffs - Appellants,

versus

School Board of the City of Portsmouth,

Defendant - Appellee.

---

O R D E R

---

The court amends its opinion filed September 21, 2000, as follows:

On the cover sheet, section 1 -- the status is changed from UNPUBLISHED to PUBLISHED.

On page 2, section 4 -- the status line is changed to read "Affirmed by published opinion.  Judge King wrote the majority opinion in which Judge Williams joined.  Judge Luttig wrote a dissenting opinion."

On page 2 -- the section referring to use of unpublished opinions as precedent is deleted.

For the Court - By Direction


/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KATHRYN RIDDICK, an infant, who
sues by her mother and next friend,
Nettie Riddick; KELLEE CHAMBERS;
TRACEE BYNUM; LAVINA FALZONE, an
infant, who sues by her mother and
next friend, Vina Falzone; NETTIE
RIDDICK; VINA FALZONE; JONELLE
WHITLEY; LATASHA WILSON,
<u>Plaintiffs-Appellants,</u>

v.

SCHOOL BOARD OF THE CITY OF
PORTSMOUTH,
<u>Defendant-Appellee,</u>

and                                              No. 99-1318

RICHARD D. TRUMBLE, individually
and in his official capacity as
Superintendent of the Portsmouth
Public Schools; LINDELL WALLACE,
individually and in his official
capacity as former Principal at
Wilson High School, DAVID
WILLETT, individually and in his
official capacity as former Athletic
Director at Wilson High School;
JOHN W. CRUTE, individually and in
his official capacity as a former
Teacher and Athletic Coach at
Wilson High School, Portsmouth,
Virginia,
<u>Defendants.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Rebecca Beach Smith, District Judge.
(CA-97-435-2, CA-97-1207-2)

Argued: May 5, 2000

Decided: September 21, 2000

Before LUTTIG, WILLIAMS, and KING, Circuit Judges.

_____

Affirmed by published opinion. Judge King wrote the majority
opinion, in which Judge Williams joined. Judge Luttig wrote a
dissenting opinion.

_____

## COUNSEL

**ARGUED:** Andrew Michael Sacks, SACKS & SACKS, Norfolk,
Virginia, for Appellants. Jeff Wayne Rosen, ADLER, ROSEN &
PETERS, P.C., Virginia Beach, Virginia, for Appellee. **ON BRIEF:**
Lisa Ehrich, ADLER, ROSEN & PETERS, P.C., Virginia Beach, Vir-
ginia, for Appellee.

_____


_____

## OPINION

KING, Circuit Judge:

In this appeal, we review an order of the district court, entered on
January 26, 1999, granting summary judgment in favor of the School
Board of the City of Portsmouth ("Board") in this action brought pur-

2

suant to 42 U.S.C. § 1983. For the reasons explained below, we affirm the district court's judgment for the Board.

I.

Kathryn Riddick (an infant who sues by her mother, Nettie Riddick), Kellee Chambers, Tracee Bynum, Lavina Falzone (an infant who sues by her mother, Vina Falzone), Nettie Riddick, Vina Falzone, Jonelle Whitley, and Latasha Wilson (collectively the "Riddick plaintiffs"), filed civil actions in the Eastern District of Virginia against multiple defendants, including Wilson High School coach John Crute, the Board, Superintendent Richard D. Trumble, Principal Lindell Wallace, and Athletic Director David Willett.

The complaints alleged, <u>inter alia</u>, that the Board was subject to liability under 42 U.S.C. § 1983 for Crute's actions taken in the course of his employ as track coach. Specifically, the complaints asserted that the Board knew of Crute's propensity to behave inappropriately towards female students and yet allowed Crute to continue his inappropriate behavior by failing to take immediate and decisive action to end such conduct, resulting in the violation of the Riddick plaintiffs' constitutional rights. The Board moved for summary judgment, contending that it could not be held liable for Crute's actions. From the bench, the district court granted the Board's motion for summary judgment, subsequently memorializing the ruling in its January 26, 1999 order. The Riddick plaintiffs now appeal.**1**

II.

In July 1995, school administrators at Wilson High School in Portsmouth, Virginia, discovered a hidden video camera in a storage

_____

**1** The Riddick plaintiffs did not contest the motion for summary judgment with respect to the claims against defendants Trumble, Wallace, and Willet, and the district court entered judgment in their favor.

After the district court granted summary judgment in favor of the Board, the Riddick plaintiffs proceeded to trial on February 16, 1999, against Coach Crute individually. Thereafter, on February 24, 1999, the Riddick plaintiffs filed a notice of appeal seeking review of the district court's January 26, 1999 order.

3

room adjoining the women's locker room. An investigation revealed that John Crute, a teacher and women's track coach, had been using the camera, beginning in late 1991 or early 1992, to secretly videotape members of the track team in various stages of undress (the "1995 incident").

The Riddick plaintiffs, track team members videotaped by the hidden camera, filed suit against the Board pursuant to section 1983, alleging a deprivation of their rights under color of state law.[2] In support of this claim, Riddick relied on a prior incident also involving Crute, in which the parents of Lakesha Coletrain, a former member of the women's track team, complained that Crute inappropriately videotaped their daughter posing in her track uniform (the "1989 incident"). After a practice session in early 1989, Crute videotaped Ms. Coletrain in her track uniform for a portfolio Crute was purportedly preparing for each team member. During the videotaping session, Coach Crute instructed Ms. Coletrain to stretch her legs on the floor and over a hurdle. He told her that if the stretching hurt, she could grunt because it would not be heard on the videotape since he would talk over it. In total, Crute videotaped Ms. Coletrain modeling eight different track uniforms. Each time Ms. Coletrain changed into a different uniform, she went into a classroom alone and closed the door behind her. When Ms. Coletrain donned a uniform that was cut particularly high in the pubic area, Crute asked her to remove her underpants because, he said, the uniform did not look good with the underpants showing.

_____

[2] Section 1983 gives injured plaintiffs a cause of action when they have been deprived of federal rights under color of state law, providing:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

4

When Ms. Coletrain's father learned of the videotaping session, he obtained a copy of the tape from Coach Crute. In a separate state court proceeding, Ms. Coletrain's father testified that the videotape showed Ms. Coletrain stretching and modeling different uniforms while Crute, who was manually operating the camera, "zoom[ed] in on her crotch, [and] zoomed in on her rear." J.A. 472. Additionally, Ms. Coletrain's father indicated that Crute was doing "a lot [of] moaning and groaning." J.A. 474.

The Coletrains immediately voiced their concerns to then-Principal Judith Kirman, who referred the matter to then-Superintendent Dr. Thomas Mack Cherry. In turn, Dr. Cherry instructed Principal Kirman to conduct an investigation to ascertain "whether or not we could corroborate that story with any other kind of behavior that would substantiate that there was any kind of improper action on anyone's part." J.A. 665. As part of her investigation, Principal Kirman instructed the then-Athletic Director, Bruce Phelps, to obtain copies of similar videotapes made by Coach Crute of each team member. Kirman proceeded to view these tapes during separate interviews with the team members and their parents or guardians. During the course of the investigation, another parent, Nettie Stephenson, expressed her discomfort with Coach Crute's videotaping. Additionally, Ms. Stephenson, whose daughter was also a member of the track team, indicated to Principal Kirman that she felt it inappropriate for Coach Crute to drive girls home after track practice.

Although the Coletrains and Ms. Stephenson considered Coach Crute's actions to be inappropriate, certain other parents did not. In late January 1989, Dr. Cherry and Principal Kirman completed the investigation and concluded that Crute's behavior was not objectionable. Nevertheless, because of the potential appearance of impropriety, Kirman directed Coach Crute to: (1) confine his videotaping of team members to track meets; (2) refrain from driving team members home after practices; and (3) take a female chaperone to all track meets outside the school district. The 1989 incident was the first complaint against Crute, and in accordance with the Board's disciplinary policy, no record of the incident was placed in his personnel file.

III.

We review an award of summary judgment de novo, viewing the facts and the inferences to be drawn therefrom in the light most favor-

5

able to the nonmovant. <u>Myers v. Finkle</u>, 950 F.2d 165, 167 (4th Cir. 1991). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

IV.

A.

The Riddick plaintiffs assert that the Board's decision to retain Crute as a teacher and track coach after the 1989 incident, and its related failure to implement sufficient precautionary measures to prevent future improper conduct by him, resulted in the deprivation of their constitutional rights in connection with the 1995 incident. Based on the 1989 incident, the Riddick plaintiffs assert that the Board knew of Crute's propensity to behave inappropriately towards female students and yet allowed Crute to continue his inappropriate behavior by failing to take immediate and decisive action to end such conduct. Specifically, they contend that "final policymaking authority" in the area of teacher discipline was delegated by the Board to the superintendent, the school principals, and other school officials. Accordingly, the Riddick plaintiffs maintain that: (1) Superintendent Cherry, Principal Kirman, Director Hinton, and Athletic Director Phelps are municipal officials whose acts may fairly be said to represent official municipal policy; and (2) these officials established, through their inaction, an official municipal policy "of being deliberately indifferent to [Crute's] perverse sexual harassment, invasion of privacy rights, and other sexually abusive conduct towards female students in the school." Br. of Appellants at 22.

B.

In order to properly review and consider this appeal, it is necessary to understand the applicable legal authorities governing such a case. First, it is well established that a municipality cannot be held liable simply for employing a tortfeasor. <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 691 (1978).**3** On the other hand, a

_____

**3** In <u>Monell</u>, the Court recognized that school boards and municipalities are indistinguishable for purposes of § 1983. <u>Id.</u> at 696.

6

municipality may be subject to liability under section 1983 if the alleged injury was caused by an identifiable municipal policy or custom. <u>Board of the County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 403 (1997). A government policy or custom need not have received formal approval through the municipality's official decision-making channels to subject the municipality to liability. Rather, when an alleged constitutional deprivation is caused by the official actions of those individuals "whose edicts or acts may fairly be said to represent official policy," the government as an entity is responsible under section 1983. <u>Monell</u>, 436 U.S. at 694. Because section 1983 was not designed to impose municipal liability under the doctrine of respondeat superior, the "official policy" requirement was "intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 479 (1986).

Of course, not every decision by every municipal official will subject a municipality to section 1983 liability. Rather, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." <u>Pembaur</u>, 475 U.S. at 481 (citation omitted). To qualify as a "final policymaking official," a municipal official must have the responsibility and authority to implement <u>final</u> municipal policy with respect to a particular course of action. <u>Id.</u> at 482-83 (emphasis added); <u>see also Spell v. McDaniel</u>, 824 F.2d 1380, 1386 (4th Cir. 1987) ("`[P]olicymaking authority' implies authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government."). Therefore, to impose municipal liability on the Board, the Riddick plaintiffs must identify municipal officials with "final policymaking authority" to implement the alleged policy of "acquiescence" with respect to Crute's conduct.

The question of who possesses final policymaking authority is one of state law. <u>Pembaur</u>, 475 U.S. at 483. In order to determine which officials possess final policymaking authority for the allegedly unconstitutional action in question, we must look to "the relevant legal materials, including state and local positive law, as well as `custom or usage having the force of law.'" <u>Jett v. Dallas Independent School</u>

7

District, 491 U.S. 701, 737 (1989) (quoting City of St. Louis v. Pra-protnik, 485 U.S. 112, 124 n.1 (1988)). In that regard, the Constitution of Virginia vests control of the public school system in the local school boards. Va. Const. art. VIII, § 7. This control includes the authority to supervise personnel. School Board v. Parham, 243 S.E.2d 468, 472 (1978). Pursuant to Va. Code Ann. § 22.1-313(A) (Michie 1999), the Board retains exclusive final authority over matters concerning the discipline of school employees. That section provides:

> The school board shall retain its exclusive final authority over matters concerning employment and supervision of its personnel, including dismissals, suspensions and placing on probation.

Va. Code Ann. § 22.1-313(A). Although the Riddick plaintiffs correctly assert that final policymaking authority may be delegated, see Pembaur, 475 U.S. at 483, there was no showing that the Board delegated any such authority in this case. While the superintendent and other school officials have limited authority to investigate complaints against teachers and to implement disciplinary policy, all *final* personnel decisions in the City of Portsmouth school system -- including decisions to terminate employees -- are subject to final review by the Board. When a municipal official's discretionary action "is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies." Praprotnik, 485 U.S. at 127. Because Dr. Cherry, Principal Kirman, Director Hinton, and Athletic Director Phelps did not possess "final policymaking authority," their actions could not constitute official municipal policy. As Judge Smith aptly recognized in her oral summary ruling:

> [T]he key is the *final* policy making. The key here is final. It is not just policy making. The school board can say to the superintendent, develop a policy. But that policy still then has to be approved by the school board. In other words, it is not just who can make policy. . . . [I]t is ultimately in the scheme of things who has the final say-so.

J.A. 1598 (emphasis added). Because the Board retained the final "say-so" on personnel matters, Judge Smith correctly concluded that

8

the Board cannot be subjected to municipal liability based on the decisions of the superintendent and principal.

C.

Even if the superintendent and other school officials had possessed final policymaking authority, the Riddick plaintiffs would have another insurmountable hurdle to overcome. A municipality is not subject to section 1983 liability simply because a claimant is able to identify conduct attributable to the municipality. Rather, "[t]he plaintiff must also demonstrate that, through its <u>deliberate</u> conduct, the municipality was the `moving force' behind the injury alleged." <u>Bryan County</u>, 520 U.S. at 404. Accordingly, to impose section 1983 liability on a municipality, a claimant must first show that "a municipal decision reflects <u>deliberate indifference</u> to the risk that a violation of a particular constitutional or statutory right will follow the decision." <u>Id.</u> at 411. If a section 1983 claimant can demonstrate the requisite degree of culpability, she must then show "a direct causal link between the municipal action and the deprivation of federal rights." <u>Id.</u> at 404.

In this regard, the Riddick plaintiffs argue that the Board -- vis-a-vis the individual administrators -- was "deliberately indifferent" to the risk that Coach Crute would, in 1995, violate the rights of the female track team members in the manner alleged. Specifically, the Riddick plaintiffs assert that the Board's actions following the 1989 incident -- exonerating Crute of any wrongdoing, retaining him as a teacher, and failing to formally discipline him -- caused a violation of their constitutional rights.

An examination of the authorities relied upon by the plaintiffs, however, supports the district court's conclusion that the Board was entitled to summary judgment. In <u>Jones v. Wellham</u>, 104 F.3d 620 (4th Cir. 1997), the plaintiff sought to impose section 1983 liability upon Maryland's Anne Arundel County after she was allegedly raped in 1990 by an on-duty police officer. The officer previously had been disciplined by the County in 1979 for an alleged sexual assault. Although a criminal investigation was launched at that time, the State's Attorney declined to file rape charges after concluding that the evidence regarding the nonconsensual nature of the incident was con-

9

flicting and was insufficient to obtain a conviction. Nevertheless, as a result of the police department's internal investigation, the officer was suspended without pay, transferred to desk duty, and required to attend counseling. Alleging that the County's failure to terminate the officer in 1979 constituted deliberate indifference to her civil rights, the plaintiff asserted that the County was subject to liability under section 1983. We properly rejected her argument, concluding that the 1979 decision to discipline the officer, rather than terminate him, did not constitute deliberate indifference. Judge Phillips observed:

> With the benefit of hindsight, [the decisions of the County] were clearly unfortunate, might perhaps be thought imprudent, or even be found legally negligent, but that does not suffice; only decisions taken with deliberate indifference to the potential consequences of known risks suffices to impose municipal liability on the basis that such decisions constituted official County "policy."

104 F.3d at 627. We concluded that the causal connection "between the decision to keep [the officer] on in 1979 and the constitutional violation ten years later is too remote to impose liability upon the County under relevant § 1983 principles." Id.

Second, the Riddick plaintiffs direct our attention to the Fifth Circuit's decision in Gonzalez v. Ysleta Indep. Sch. Dist., 996 F.2d 745 (5th Cir. 1993), where a female student and her parents brought a section 1983 action against the school district, alleging that injuries received by the student when she was sexually molested by a teacher were attributable to the school district. The plaintiffs' municipality liability theory was premised on the school district's failure to terminate the teacher's employment when he was accused of molesting another student two years earlier. The lack of evidence corroborating the earlier student's claim led the school district to simply issue a written reprimand and to transfer the teacher to another school. The court declined to conclude that the school board acted with deliberate indifference in failing to terminate the teacher's employment, writing:

> We also agree . . . that the Board's choice to transfer [the teacher] rather than impose a more severe sanction was not only negligent but also inconsistent with the district's han-

10

dling of other cases of suspected sexual abuse. <u>But these facts, by themselves, are not sufficient to establish that the Board was deliberately indifferent to the welfare of students in making its decision.</u>

996 F.2d at 762 (emphasis added).

Third, the Riddick plaintiffs rely on another Fifth Circuit decision, <u>Doe v. Dallas Indep. Sch. Dist.</u>, 153 F.3d 211 (5th Cir. 1998), where a third-grade teacher was discovered to have sexually molested numerous male students from 1983 to 1987. The teacher was subsequently convicted of one count of aggravated sexual assault and two counts of indecency with a child. Following the convictions, plaintiffs sought to impose section 1983 liability on the school district, asserting that school officials knew or should have known of the sexual abuse and that, despite such knowledge, they acted with deliberate indifference to the plaintiffs' constitutional rights. Specifically, the plaintiffs relied on a 1986 complaint against the teacher, in which the mother of a male student complained to the principal that the teacher had fondled her son. The principal investigated the allegation, concluded that it was not true, and the school district therefore took no disciplinary action against the teacher. The section 1983 plaintiffs contended that failure to reprimand the teacher formally, or transfer him, was indicative of the school district's "deliberate indifference." The Court of Appeals rejected this contention, writing:

> [T]he fact that [the principal] misread the [1986] situation and made a tragic error in judgment does not create a genuine issue of material fact as to whether she acted with deliberate indifference toward [the students'] constitutional rights.

153 F.3d at 219.

The Riddick plaintiffs' reliance on these decisions does little to advance their claim, since none of them found "deliberate indifference" on facts similar to this case. Nevertheless, they attempt to distinguish <u>Jones</u>, <u>Gonzales</u>, and <u>Doe</u> by asserting that the prior misconduct in these cases was more dissimilar and remote in time than the 1989 complaint in this case. We are unpersuaded. When

11

Crute was investigated in 1989 for openly filming fully-clothed female students, it was not plainly obvious that he would videotape other students with a hidden camera nearly three years later. As Judge Smith observed from the bench, "there [was] no indication that anyone could predict any causal link or moving force behind the disciplinary action in 1989 to the egregious conduct that is alleged to have started occurring some two years later." J.A. 1637. Thus, the evidence simply does not support a finding that the school officials investigating the 1989 allegation ignored "the potential consequences of known risks." Jones, 104 F.3d at 627. Put simply, the causal connection between the 1989 incident and the alleged constitutional deprivation is simply too attenuated to impose municipal liability on the Board.

The Riddick plaintiffs also argue that Jones, Gonzales, and Doe are distinguishable because the municipal employees in those cases were actually disciplined as a result of their prior transgressions, while Coach Crute was exonerated from any alleged 1989 wrongdoing. Because the Riddick plaintiffs disagree with Dr. Cherry and Principal Kirman's conclusion that Crute's consensual videotaping of fully-clothed students in 1989 did not warrant formal discipline, they argue that the Board acted with "deliberate indifference." This argument is misguided. Admittedly, in light of his subsequent reprehensible behavior, the failure to terminate Crute in 1989 was unfortunate and perhaps ill-advised. However, short-sightedness does not suffice to establish "deliberate indifference." As the district judge insightfully recognized in her oral ruling:

> In retrospect, everybody may wish they had done something more extreme. But that's hindsight. At the time they took the action based upon the investigation that they made, and they didn't fail to find something that was in existence at the time, and I cannot find as a matter of law on these undisputed facts that this single lawful disciplinary decision back in 1989 was the moving force that then caused these allegedly unconstitutional acts to occur or that there is any showing of deliberate indifference on the part of the superintendent, the principal, or the athletic director, even if somehow you could say they were final policy-making authorities.

12

J.A. 1638-39.

Accordingly, even if Dr. Cherry, Principal Kirman, or some other school administrator had been a "final policymaking official" whose actions were attributable to the Board, the Riddick plaintiffs have also failed to demonstrate "deliberate indifference." We must conclude that the evidence, viewed in the light most favorable to the Riddick plaintiffs, is simply insufficient to impose liability on the Board under section 1983.

V.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

LUTTIG, Circuit Judge, dissenting:

Coach Crute was charged with responsibility over the girls' track team at Wilson High School in Portsmouth, Virginia. Crute video-taped a female student after hours in a remote and isolated part of the campus, instructed the student to remove her underpants for the camera, and zoomed in on her crotch, moaning and groaning during the encounter. In response to Crute's actions, the Superintendent, Principal, and Director of Secondary Education took no disciplinary action whatsoever, characterizing Crute's behavior as "not objectionable." Unsurprisingly, in the events that give rise to this lawsuit, Crute was thereafter found videotaping, with a hidden camera, female students as they undressed and dressed in the girls' locker room -- conduct for which the plaintiffs now seek to hold the School Board liable under 42 U.S.C. § 1983.

The majority holds today that no liability under section 1983 lies against the School Board for Crute's conduct because -- and merely because -- the School Board formally retains review authority over all individual disciplinary decisions pursuant to state statute. Because the majority's holding rests on an obviously mistaken understanding of the scope of municipal liability under section 1983, and because a

13

reasonable jury could readily conclude both that the School Board has effectively delegated final policymaking authority over personnel disciplinary decisions to the individual defendants and that those individual officials were deliberately indifferent to the constitutional harm that ultimately befell the plaintiffs, I dissent from the majority's affirmance of summary judgment for the defendants.

I would unhesitatingly hold, on the facts alleged, that the plaintiffs are entitled to a jury trial on their claim against the School Board that their daughters' constitutional rights were violated by Crute's conduct. Indeed, were it my role to do so, I would hold as a matter of law that the officials in question were deliberately indifferent as a result of their inexcusable failure to act in the face of warning signs that would have been obvious to anyone responsible enough to be entrusted with the education and safety of children, and that I suspect were in truth obvious to the individual defendants in this case.

I.

The majority's error, as I allude to above, is in its apparent failure to recognize that subordinate officials can be final policymakers, even absent a formal delegation of final decisionmaking authority from the principal: That is, the majority mistakenly concludes that a statutorily designated policymaker who retains but pro forma final review authority is, and can be, the only final policymaker for purposes of municipal liability under section 1983. This is simply not the case, however. As both the Fifth and Seventh Circuits have held, a principal decisionmaker's practice of acquiescence in the decisions of a subordinate can result in municipal liability for the actions of that subordinate, even where, as here, the principal municipal policymaker formally retains final review authority over all decisions by subordinates. See Gros v. City of Grand Prairie, 181 F.3d 613, 616 n.2 (5th Cir. 1999) (stating that a statutorily designated policymaker's customary refusal to exercise some theoretical final review authority over a municipal official can establish that official as the final policymaker); Canfield v. Consolidated High School Dist. No. 230, 991 F.2d 1316, 1325 (7th Cir. 1993) (stating that a practice of committing disciplinary matters to the discretion of a subordinate in a school system arguably "could result in the actions of the subordinate, however conducted, being municipal policy as long as the official is acting

14

within the scope of his or her employment"). To my knowledge, no circuit has held otherwise. Certainly, ours has not. We have long held, as have the Fifth and Seventh Circuits, that municipal liability can lie where final decisionmaking authority effectively resides in the municipality's subordinate officials. <u>See</u>, <u>e.g.</u>, <u>Austin</u> v. <u>Paramount Parks, Inc.</u>, 195 F.3d 715, 729-730 (4th Cir. 1999) (finding that a municipal corporation may be liable under section 1983 for the actions of a subordinate official if that official in fact exercised final policymaking authority); <u>Spell</u> v. <u>McDaniel</u>, 824 F.2d 1380, 1386 (4th Cir. 1987) (stating that "a municipal governing body may not avoid attribution of policy to itself simply by officially retaining unexercised ultimate authority to countermand a policy or to discipline or discharge the policymaker.").

In this case, the majority's (and the district court's) inquiry into who could be deemed a policymaker begins and ends with a determination that the School Board never formally delegated its statutorily-conferred final review authority over disciplinary decisions. Based upon this determination of the absence of formal delegation, and this determination alone, the majority concludes that the School Board cannot be liable for the actions of its subordinate employees. However, such is to pretermit the inquiry. For, as explained, even if a governmental entity with final policymaking authority has technically retained its formal policymaking authority, it may yet be liable if, through a custom or practice of acquiescence in the decisions of its subordinates, it has <u>effectively</u> delegated its authority to those subordinates. <u>See Jett</u> v. <u>Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 737 (1989); <u>City of St. Louis</u> v. <u>Praprotnik</u>, 485 U.S. 112, 123 (1988). Were it otherwise, a municipality could essentially insulate itself from all liability merely by vesting ultimate review authority in its governing body, while at the same time surrendering all effective authority to its subordinate officials. <u>See Praprotnik</u>, 485 U.S. at 126. Most assuredly, this was not congressional intent in enacting section 1983, nor would I so construct that provision, the very purpose of which is to ensure accountability for official denial of constitutional right.

As even the majority acknowledges, <u>ante</u> at 6, the plaintiffs allege in their complaint that the School Board did delegate the authority to establish disciplinary policy to the individually named defendants, J.A. 139, and that the defendants established policy with respect to

15

Crute's misconduct, J.A. 142, 144. And, in his affidavit, the Superintendent testified that he in fact is responsible for "developing and implementing policies and procedures for investigating complaints made against teachers by parents and [for] developing and implementing disciplinary procedures." J.A. 241. Because it can be reasonably inferred from these facts, if not others as well, that the Superintendent, Director of Secondary Education, and Principal have actual policymaking authority over complaint referrals and teacher discipline, J.A. 489-91, 665-69, 681-82, I would hold that the district court erred in granting the defendants summary judgment on the question of the School Board's susceptibility to suit. Accordingly, I would vacate the district court's judgment and remand with instructions to provide the plaintiffs an opportunity to prove that final policymaking authority on school disciplinary matters in the City of Portsmouth effectively resides in the Superintendent, Director of Secondary Education, School Principal, or some combination of the three.*

II.

Having held that a jury could reasonably conclude that the School Board may permissibly be held liable under section 1983 for the conduct of its individual defendant employees, I would likewise hold that there is a genuine issue of material fact as to whether the defendants

_____

* Even were I not of the view that the plaintiffs have presented a triable issue on whether the individual defendants possess final policymaking authority in the area of personnel discipline, I would still vacate the judgment of the district court and remand for trial because I believe that the record contains ample evidence that the School Board actually knew of Crute's past behavior and the complaints against him. For instance, one aggrieved parent testified that "we showed [Crute's] tape to the people at the School Board," J.A. 477, and "went down to the School Board office and complained. And what we were told then was that they couldn't do anything about it right now. What they needed to do is get with [the Principal] and get other people in and we just all sat down and talked about it." J.A. 489. These two statements would be enough, in my view, to create a genuine issue about whether the School Board itself had actual knowledge about Crute's prior activities and propensities, and therefore should be held liable for its own (in)actions in failing to prevent the constitutional deprivation suffered by plaintiffs and their minor daughters.

acted with deliberate indifference to an obvious risk of constitutional harm.

If school or other officials fail to heed obvious warning signs that would place a reasonable person on notice of the potential for future harmful conduct, their inaction can, as it should, constitute deliberate indifference under section 1983. A jury presented with the evidence of Crute's past actions could easily conclude that the defendants in this case acted with such deliberate indifference. The plaintiffs allege, J.A. 476-77, that the defendants knew that Crute (1) videotaped a female student on his track team in a deserted and remote location in the school after hours, J.A. 495-96; (2) instructed the student to remove her underpants because, he told her, the uniform did not look good with the underpants showing, J.A. 498; and (3) "zoom[ed] [the camera] in on [the] crotch, [and] zoomed in on [the] rear" of the student, while doing "a lot [of] moaning and groaning," J.A. 472, 474. Past behavior may be predictive of similar future conduct, and unlike the majority, I categorically reject the argument advanced by the defendants and uncritically accepted by the district court that this reprehensible conduct did not portend the events that eventually followed. But even more importantly, the court is obliged to reject that argument in adjudicating the <u>defendants</u>' motion for summary judgment.

Based upon the foreseeability of the harm that actually occurred, and the undisputed evidence that school officials did not discharge Crute for his prior perversity, did not discipline him, did not reprimand him, did not counsel him, J.A. 1295-96, and did not even so much as note the incident in his file, a jury could not only reasonably, but readily, conclude that such official inaction constitutes a complete abdication of an affirmative duty to act -- deliberate indifference to foreseeable risk of harm. Such a conclusion would only be more reasonable given that, at the same time that school officials maintained that Crute's behavior was "not objectionable," they actually prohibited him from (1) videotaping track members outside of track meets; (2) driving team members home after practice; and (3) attending track meets outside the school district without a female chaperone. J.A. 543. These defendant-imposed limitations on Crute's interaction with the school's female students amply refute to the reasonable mind the defendants' (frankly, incredible) claims that they found nothing

17

objectionable in Crute's conduct and thus reasonably could not have foreseen that Crute would engage in the substantially similar, albeit more egregious, conduct for which the plaintiffs now seek to hold the School Board liable.

None of the three cases relied upon by the majority for its contrary decision even supports the majority's decision; and certainly none of them even remotely purports to foreclose the conclusion that is mandated by the plaintiffs' evidence. In both <u>Jones</u> v. <u>Wellham</u>, 104 F.3d 620 (4th Cir. 1997), and <u>Gonzalez</u> v. <u>Ysleta Independent Sch. Dist.</u>, 996 F.2d 745 (5th Cir. 1993), the policymakers acknowledged that the conduct was inappropriate by punishing the wrongdoers. Here, the school officials took no punitive action against Crute, claiming that his conduct was "not objectionable." In <u>Doe</u> v. <u>Dallas Independent Sch. Dist.</u>, 153 F.3d 211 (5th Cir. 1998), the school administrators concluded that the allegations against the teacher were untrue. Here, in contrast, the school officials not only found the allegations against Crute to be true; they failed even to appreciate the patent impropriety of the conduct -- a failure that, in my view, easily satisfies the definition of deliberate indifference.

Accordingly, in addition to holding that the School Board may be held accountable for the actions of its subordinate employees in this case, I would hold that the plaintiffs have presented a jury question on the question of the defendants' deliberate indifference to the plaintiffs' daughters' constitutional rights. Indeed, were it within my role to do so, I would hold as a matter of law on the record before us that the defendants were deliberately indifferent to the rights of these children.

III.

In today's society, the denial of constitutional right often occurs as a result of bureaucratic paralysis in the face of conduct that would place any reasonable person on notice of the need for preventive action, paralysis frequently attributable to fear of either political offense or personal reprisal. The denial of rights often occurs not so much as a result of the exercise of poor judgment, but as a result of the complete inability to exercise any judgment at all. And this paralysis is followed increasingly by the universal denial of official

18

responsibility once the plainly foreseeable actually occurs. I believe section 1983 was intended to have full force in just such circumstances. I would give the statute that full force and hold that neither the Portsmouth School Board's statutory retention of final review authority over the school district's personnel decisions nor its incredible claim that it finds nothing objectionable in Coach Crute's conduct enables the Board to escape liability for the alleged deliberate indifference of its employees in this case. To hold otherwise is to rob section 1983 of much of its intended deterrent value by allowing municipalities to avoid liability for constitutional deprivation through administrative artifice or bureaucratic incapacitation, respectively.

19