326 F.3d 463
 David LYTLE; Jeanette Lytle; Joan Maguire, Plaintiffs-Appellees,
v.
Jack DOYLE, in his official capacity as Norfolk Commonwealth Attorney; Commissioner, of Transportation of the Commonwealth of Virginia, Defendants-Appellants, and
City of Norfolk, Virginia, Defendant.
David Lytle; Jeanette Lytle; Joan Maguire, Plaintiffs-Appellants,
v.
City of Norfolk, Virginia, Defendant-Appellee, and
Jack Doyle, in his official capacity as Norfolk Commonwealth Attorney; Commissioner, of Transportation of the Commonwealth of Virginia, Defendants.
 No. 02-1056.
 No. 02-1076.
 United States Court of Appeals, Fourth Circuit.
 Argued: January 23, 2003.
 Decided: April 14, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED ARGUED: Maureen Riley Matsen, Office of the Attorney General of Virginia, Richmond, Virginia; Michael Joseph DePrimo, American Family Association Center for Law and Policy, Tupelo, Mississippi, for Appellants. Harold Phillip Juren, Chief Deputy City Attorney, City Attorney's Office, Norfolk, Virginia, for Appellees. ON BRIEF: Jerry W. Kilgore, Attorney General of Virginia, William H. Hurd, State Solicitor, Judith Williams Jagdmann, Deputy Attorney General, William E. Thro, Special Assistant Attorney General, Kevin O. Barnard, Assistant Attorney General, Richmond, Virginia; Brian Fahling, Stephen Melvin Crampton, American Family Association Center for Law and Policy, Tupelo, Mississippi, for Appellants. Jack E. Cloud, Deputy City Attorney, City Attorney's Office, Norfolk, Virginia, for Appellees.
 Before WILKINSON, MICHAEL, and KING, Circuit Judges.
 Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Judge MICHAEL and Judge KING joined.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 Plaintiffs David Lytle, Jeanette Lytle, and Joan Maguire challenge the constitutionality of Virginia Code § 46.2-930 which prohibits loitering on certain Virginia bridges. Officers from the Norfolk Police Department, relying on this statute, threatened the plaintiffs with arrest for participating in a peaceful protest on a City bridge. Although we recognize the state's legitimate interests in public safety, the application of this anti-loitering provision to plaintiff's expressive activity is constitutionally infirm. We thus affirm the district court's award of declaratory relief to plaintiffs, albeit on different grounds. The district court also held that there was no municipal liability in this case and declined to award damages to plaintiffs. See Lytle v. Doyle, 197 F.Supp.2d 481 (E.D.Va. 2001). We affirm these rulings as well.
 
 I.
 
 2
 David Lytle, Jeanette Lytle, and Joan Maguire ("the Lytles") participated in a pro-life demonstration on July 16, 1999, at the Piccadilly Overpass located at the intersection of Norview Avenue and Interstate 64 in Norfolk, Virginia. The Lytles, along with other protesters, were attempting to convey their message to motorists traveling on the interstate below by displaying large signs depicting their views on abortion. The Virginia Department of Transportation had previously hung "No Loitering" signs on this overpass. The Lytles ceased their protest activities when they were threatened with arrest for their conduct. They now challenge the facial constitutionality of Virginia Code § 46.2-930 and the application of the statute to them in this manner.
 
 
 3
 Virginia Code § 46.2-930 provides that pedestrians "shall not loiter on any bridge on which the Commonwealth Transportation Commissioner has posted signs prohibiting such action." The Commissioner considers a number of public safety concerns in determining whether to post "No Loitering" signs on a given bridge. These concerns include whether loitering pedestrians might be distracting to motorists, whether they might drop objects on vehicles using the highway beneath the bridge, whether they might be struck by vehicles on the bridge, and whether they might fall off the bridge, injuring themselves or those below. Before any Virginia bridge is given a "No Loitering" designation, the Commissioner consults with the appropriate district traffic engineer about specific safety concerns on the bridge.
 
 
 4
 Prior to the present incident, protesters had staged at least two other pro-life demonstrations on the Piccadilly Overpass. On July 25, 1997, the Lytles gathered with other protestors at the overpass and were ordered by state and local police officers to leave. Virginia Code § 46.2-930 was not mentioned during this incident and none of the protestors were arrested. The following year, on July 31, 1998, the Lytles returned to the overpass and resumed protesting. The Norfolk police again responded. They informed the protestors that the activity on the bridge was adversely affecting traffic patterns and creating a dangerous situation. Again, no mention was made of Virginia Code § 46.2-930 and no signs were posted on the bridge at this time. There is no indication that the officers involved in the various protests were the same.
 
 
 5
 Following the second incident, Captain Sharon Chamberlain asked Lieutenant Betty Davis to investigate different options for handling the ongoing problems at the overpass. At some point in August 1998, "No Loitering" signs were posted at the Overpass, presumably by the Virginia Department of Transportation. The signs were most likely posted at the request of someone in the police department. However, neither the City Manager, the Assistant City Manager overseeing the police department, nor the Chief of Police knew of their existence.
 
 
 6
 On August 7, 1998, Davis prepared a memorandum instructing officers on how to deal with protestors on the Piccadilly Overpass. The Davis Memo advised any officer who observed demonstrators on the bridge to issue a summons pursuant to Virginia Code § 46.2-930. Davis left a copy of the document for Chamberlain, with a note stating that the original was put in the Division's roll call book where information for the officers was kept. Although officers are supposed to review the roll call book regularly, there is no indication that any of the officers in the division actually read this memo. The contents of the memo were not relayed to the officers in any other manner. Lieutenant Charles Brewer, the officer who responded to the July 16, 1999 protest, testified that he never saw the memo until it was given to him by Chamberlain as he left for the Piccadilly Overpass that day.
 
 
 7
 When Brewer arrived at the Piccadilly Overpass, he noted that the demonstrators were carrying large signs expressing their opposition to abortion. Several of the protestors had leaned the signs up against the railings, pointed down at the traffic below the bridge. Brewer also noted that traffic conditions were heavy and that traffic was beginning to back up near the overpass. After observing this scene, Brewer and another officer approached the protestors and provided them with copies of Virginia code § 46.2-930, as Brewer had been instructed to do by Chamberlain. Brewer told the protestors that, pursuant to that statute, they would be arrested if they did not cease their activities. After the officers arrested two fellow demonstrators, the Lytles left the overpass.
 
 
 8
 After being informed of the July 16, 1999, demonstration and the circumstances surrounding it, the Chief of Police disseminated a memorandum to all commands in the Norfolk Police Department stating that the Attorney General's office was reviewing the constitutionality of Virginia Code § 46.2-930. In the meantime, officers were not to rely on that statute when handling protest situations arising on bridges or overpasses.
 
 
 9
 The Office of the Attorney General discovered that the "No Loitering" signs posted on the Piccadilly Overpass had never been approved by the Commissioner or his designee. Based on this determination, the charges against the two protestors were dropped and the Lytles were notified that the Commonwealth was suspending enforcement of the statute on the bridges in the area.
 
 
 10
 On August 27, 1999, the Lytles filed a complaint against Charles Brewer,[1] Charles Griffith, in his official capacity as Norfolk's Commonwealth's Attorney, and Governor James Gilmore challenging the constitutionality of Virginia Code § 46.2-930 and seeking injunctive and nominal monetary relief. The Lytles alleged that the statute was unconstitutional both on its face and as applied to their conduct because it violated their First and Fourteenth Amendment rights.
 
 
 11
 On November 2, 1999, the district court granted the Lytles' motion for a preliminary injunction. See Lytle v. Brewer, 73 F.Supp.2d 615, 619 (E.D.Va.1999). The Governor and Commonwealth's Attorney appealed and contended the Governor was not a proper party to the litigation. See Lytle v. Griffith, 240 F.3d 404 (4th Cir. 2001). On remand, the district court dismissed the Governor but permitted the Lytles to substitute Charles Nottingham, in his official capacity as the Commissioner of Transportation of Virginia, as the appropriate defendant. Lytle v. Doyle, 197 F.Supp.2d at 482.
 
 
 12
 The parties then filed cross-motions for summary judgment. On December 17, 2001, the district court declared Virginia Code § 46.2-930 to be facially invalid on the ground that it was unconstitutionally vague. The district court also held in favor of the Lytles on their due process claim, but did not reach their First Amendment claim. On the issue of municipal liability, however, the district court granted sum-mary judgment in favor of the City on the ground that the deprivation of their rights was not caused by a municipal policy or custom. The Commissioner appealed the district court's invalidation of § 46.2-930 and the Lytles cross-appealed on the issue of municipal liability. We shall address these issues in turn.
 
 II.
 A.
 
 13
 The Fourteenth Amendment requires a state to provide citizens fair warning of the conduct that might subject them to criminal sanctions. Giaccio v. Pennsylvania, 382 U.S. 399, 402-403, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966). A law is unconstitutionally vague if it fails to provide the kind of notice that will enable citizens to conform their behavior to that law. And "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." City of Chicago v. Morales, 527 U.S. 41, 58, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (internal citations omitted). Because Virginia Code § 46.2-930 did not provide fair warning to plaintiffs that they might be arrested for participating in a peaceful demonstration, application of the statute to them is invalid.
 
 
 14
 The Commissioner argues that the district court incorrectly invalidated Virginia Code § 46.2-930 as unconstitutionally vague. He contends that the statute plainly prohibits loitering on designated bridges, and that a person of ordinary intelligence understands perfectly well what it means to loiter. Therefore, the Commissioner argues, the Lytles had reasonable notice that they were violating the law and might be subject to sanctions.
 
 
 15
 The Supreme Court addressed this issue in City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). In that case, the Chicago City Council enacted an ordinance that prohibited "criminal street gang members" from "loitering" with one another or with other persons in any public place. Morales, 527 U.S. at 45-46, 119 S.Ct. 1849. The ordinance created a criminal offense punishable by a fine of up to $500 and imprisonment for not more than six months. Id. at 47, 119 S.Ct. 1849. While recognizing Chicago's interest in reducing gang criminality, the Court nonetheless found the statute void for vagueness because "the definition of `loiter' provided by the ordinance [did] not assist in clearly articulating the proscriptions of the ordinance." Id. at 51, 119 S.Ct. 1849 (quoting City of Chicago v. Morales, 177 Ill.2d 440, 227 Ill.Dec. 130, 687 N.E.2d 53, 60-61). Because being in a gang is not itself illegal, and because standing in a given location also is not per se illegal, individuals were left unsure when they might run afoul of the law. Id. at 57. This statute, therefore, did not provide the type of fair warning that the Fourteenth Amendment requires.
 
 
 16
 Here, as in Morales, "the vagueness that dooms this ordinance is not the product of uncertainty about the normal meaning of `loitering,'" but rather about what specific conduct is covered by the statute and what is not. 527 U.S. at 57, 119 S.Ct. 1849. Virginia Code § 46.2-930 did not give plaintiffs proper notice that the core political speech and expressive activity in which they were engaged was prohibited by law. If anything, the language of the statute, prohibiting "loitering" on bridges, suggested that their conduct would be permitted.
 
 
 17
 As the Commissioner noted in his brief, "loitering" has "by long usage acquired a common and accepted meaning." According to Webster's Dictionary, this meaning is "to stand idly about." Webster's II New College Dictionary 645 (1999). The expressive activity in which these plaintiffs engaged, however, does not fall within this definition. Loitering is aimless. Social protest is by definition purposeful. The Lytles were exercising their First Amendment right to speak out peacefully against a practice with which they disagreed. No reasonable person would know that protesting and loitering were one and the same activity and that an anti-loitering statute would attach criminal sanctions to the classic political expression undertaken by the Lytles. Therefore, Virginia Code § 46.2-930 cannot have been constitutionally applied to the plaintiffs. For this reason, the declaratory judgment of the district court must stand.[2]
 
 B.
 
 18
 While we agree that Virginia Code § 46.2-930 is unconstitutional as applied to the Lytles, we do not go as far as the district court. That court's facial invalidation of the statute was so sweeping as to eviscerate the significant interests the State has in traffic and pedestrian safety.
 
 
 19
 The district court held that Virginia Code § 46.2-930 was unconstitutional on its face because it required no proof of criminal intent on the part of potential violators. Lytle v. Doyle, 197 F.Supp.2d at 490. The Court in Morales did point out the lack of a mens rea component in the Gang Congregation Ordinance at issue in that case. Morales, 527 U.S. at 55, 119 S.Ct. 1849. However, the ordinance at issue there had a much different purpose and means for effectuating that purpose than the statute at issue here.
 
 
 20
 In Morales, as we noted earlier, the City was concerned with the potential for violence and criminal activity when groups of gang members got together. Id. at 51, 119 S.Ct. 1849. The Supreme Court held, however, that a statute that prohibited gang members from meeting with anyone, anywhere, and at any time could not stand without evidence that these meetings had an apparently harmful purpose or effect. Id. at 58, 119 S.Ct. 1849. Virginia Code § 46.2-930, however, does not prohibit activity in any public place, but rather is designed to protect motorists and pedestrians from hazardous highway conditions in a few specific locations. The criteria for determining whether a bridge should be designated "No Loitering" all relate to whether individuals walking on the bridge or driving on the road below might be injured by such loitering. And while application of this anti-loitering statute to the Lytles was inappropriate, it is uncontested that the State may act to protect its substantial and legitimate interest in traffic safety. See Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507-508, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).
 
 
 21
 Under the district court's mens rea logic, the State would be unable to protect this interest by prohibiting people from congregating in certain areas at certain times. That view is incorrect. The Supreme Court has already held that valid safety interests "cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection." Cox v. Louisiana, 379 U.S. 536, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). So, for example, "[o]ne would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly." Id.
 
 
 22
 Although Virginia Code § 46.2-930 as applied to the Lytles' expressive protest is invalid, the State can properly enforce its interest in other ways. For instance, where expressive or associative activity runs afoul of concerns for traffic safety, time, place, and manner restrictions have long been held constitutional. The "place" restriction in this instance may be a bridge or overpass where the dangers to distracted motorists or to pedestrians are apparent. Such restrictions must, of course, afford the notice that was lacking here and be "justified without reference to the content of the regulated speech, [be] narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (internal quotations omitted). The district court's rationale, however, failed to recognize that restricting activity on particular bridges to protect specific safety concerns might be constitutional. This goes far beyond Supreme Court precedent.
 
 III.
 
 23
 We turn next to the Lytles' cross appeal on the issue of municipal liability. The Lytles argue that the district court erred in granting summary judgment to the City on the Lytles' 42 U.S.C. § 1983 claim. We disagree.
 
 
 24
 To prevail on a § 1983 claim, the Lytles must show that (1) they were deprived of a federal statutory or constitutional right; and (2) the deprivation was committed under color of state law. American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). As discussed above, the Lytles have indeed shown a deprivation of their Fourteenth Amendment right to due process. However, not every deprivation of a constitutional right will lead to municipal liability. Only in cases where the municipality causes the deprivation "through an official policy or custom" will liability attach. Carter v. Morris, 164 F.3d 215, 218 (4th Cir.1999).
 
 
 25
 A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest [s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." Id. at 217 (internal citations omitted). The Lytles contend that the City of Norfolk is liable on each of these four grounds.
 
 A.
 
 26
 The Lytles first argue that the Davis Memo constituted an official City policy because the memo contained a fixed plan for dealing with protestors that was intended for indefinite enforcement. Lieutenant Brewer was following this plan, they contend, when he threatened the Lytles and therefore the City should be liable for their injury. The Davis Memo, however, cannot constitute an official written policy of the City because it was never approved by the City Manager in whom the Norfolk City Charter vests ultimate authority over the police department. See Norfolk City Charter §§ 50, 60.
 
 
 27
 The Lytles try to surmount this obstacle by arguing that the City attempted to insulate itself from liability by deliberately allowing the formulation of police procedures without City Manager review. Although "egregious attempts by local governments to insulate themselves from liability for unconstitutional polices are precluded," St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion), there is no indication in the record that the City of Norfolk undertook such actions. The City's policies specifically require that no one with a rank lower than Chief of Police issue any written directives. And when the Chief of Police learned of the unauthorized memo, he immediately suspended its enforcement and the application of Virginia Code § 46.2-930 to similar situations.
 
 
 28
 Moreover, the record indicates that few, if any, officers in the division were even aware of the Davis Memo. The memo was never pointed out to the officers, and its contents were never communicated to them. Lieutenant Brewer testified that he had never seen the memo before Captain Chamberlain handed it to him on July 16, 1999. Thus, this document was merely an unauthorized memorandum written by a police captain that was followed by a Norfolk police officer on a single occasion — not an official City policy.
 
 B.
 
 29
 The Lytles next argue that Captain Chamberlain was a final policymaker for the City for the purposes of setting policy within her Second Patrol Division. Because the City Manager gave Captain Chamberlain no direction or guidance concerning protest activity on the Piccadilly Overpass, the Lytles argue that she had unbridled discretion to establish the City's policy in this arena. Therefore, Chamberlain's approval of the Davis Memo was sufficient to establish a municipal policy for which the City should be held liable.
 
 
 30
 A "final policymaker" for the purposes of municipal liability is someone who has "the responsibility and authority to implement final municipal policy with respect to a particular course of action." Riddick v. School Bd. of the City of Ports-mouth, 238 F.3d 518, 523 (4th Cir.2000) (emphasis deleted). A local government may be held liable for a decision made by an individual "whose edicts or acts may fairly be said to represent official policy." Id. However, merely "going along with the discretionary decisions made by one's subordinates... is not a delegation to them of the authority to make policy." Praprotnik, 485 U.S. at 130, 108 S.Ct. 915. Additionally, the type of policymaking authority which can invoke § 1983 liability is "authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir.1987). Whether an official has sufficient policymaking authority is a question of state law. Praprotnik, 485 U.S. at 124, 108 S.Ct. 915. The examination of state law allows for consideration of whether policymaking authority in fact rests where state law has placed it. See Crowley v. Prince George's County, 890 F.2d 683, 686 (4th Cir.1989).
 
 
 31
 The Norfolk City Charter provides that the City Manager, acting as the director of public safety, is in charge of the police department. All orders, rules, and regulations applicable to the entire police department must be approved by the City Manager. The City Manager is therefore clearly the final policymaker for purposes of § 1983 liability. Some policies for the police department, so called standard operating procedures, may be approved by the Chief of Police rather that the City Manager. At most, then, the Chief of Police could be considered a final policymaker for the police department. And no one lower in rank than the Chief of Police is authorized to issue any written directives.
 
 
 32
 Moreover, the City Manager and Chief of Police did not delegate power to Captain Chamberlain. At all times the power to make decisions for the department rested with them. In fact, as we have already pointed out, the Chief of Police issued a directive that the Davis Memo should not be followed as soon as he learned of its existence. The police department has multiple captains and multiple lieutenants, and it is far-fetched to assert that each of these individuals has the power to be a final policymaker for the city. Captains are sixth in the chain of command for the department, far from the level where ultimate policy decisions are made. And while Virginia courts are split as to who exactly may be a final policymaker for § 1983 purposes, "none suggests that lower police officials have such authority." Donaggio v. Arlington County, 880 F.Supp. 446, 462 (E.D.Va.1995). Captain Chamberlain was not a final policymaker under state law, and therefore liability will not attach through this means.
 
 C.
 
 33
 Even if Captain Chamberlain is not deemed a final policymaker, the Lytles argue that the City should be held liable because enforcement of Virginia Code § 46.2-930 was an unconstitutional custom or practice. Such a custom "may arise if a practice is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." Carter, 164 F.3d at 218 (internal citation omitted). The Lytles contend that the Davis Memo represented a standard operating procedure, as evidenced by its placement in the roll call book. These procedures, which do not need to be approved by the City Manager, are by their very nature the custom and practice of the division.
 
 
 34
 It is well settled that "isolated incidents" of unconstitutional conduct by subordinate employees are not sufficient to establish a custom or practice for § 1983 purposes. Carter, 164 F.3d at 220. Rather, there must be "numerous particular instances" of unconstitutional conduct in order to establish a custom or practice. Kopf v. Wing, 942 F.2d 265, 269 (4th Cir. 1991). Here, there is no evidence that Virginia Code § 46.2-930 was ever enforced by any Norfolk police officer prior to July 16, 1999, and it has not been enforced since. Police responded to protestors on the bridge only twice prior to the incident in question, neither time invoking this particular statute.
 
 
 35
 Moreover, the Davis Memo cannot be a custom or practice when there is no evidence that any officer within the Second Patrol Division ever even read it. Lieutenant Brewer had not heard of the Davis Memo until the date of the incident in question. If applying Virginia Code § 46.2-930 to protestors was a widespread practice of the division, Brewer certainly would have known of it. The isolated incidents on the Piccadilly Overpass, combined with a single application of the statute, cannot approach the sort of widespread and permanent practice necessary to establish a custom.
 
 D.
 
 36
 Lastly, the Lytles argue that the City should be liable because it showed deliberate indifference to their rights by failing to adequately train Norfolk police officers in citizens' First and Fourteenth Amendment rights. The way in which a City chooses to train its police force is "necessarily a matter of policy." Spell, 824 F.2d at 1389. Section 1983 liability may attach if officers are not adequately trained "in relation to the tasks the particular officers must perform," and this deficiency is "closely related to the ultimate injury." Canton v. Harris, 489 U.S. 378, 390-91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).
 
 
 37
 The training provided to officers in the Norfolk Police Department is extensive, varied, and on-going. The officers must attend basic recruit school, receive four months of field training, and attend inservice training and regular seminars on special topics. The Lytles have not provided any evidence that additional training would have resulted in Lieutenant Brewer or the other Norfolk police officers responding any differently. Officers cannot be expected to analyze the complex issues of law surrounding every statute they are required to enforce and then to decide whether the statute is constitutional. And the City cannot be required to anticipate every situation that officers will face. Board of Com'rs of Bryan Cty. v. Brown, 520 U.S. 397, 409-10, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). The situation here was hardly one that occurred with sufficient frequency such that a failure to properly train officers to handle it reflected a reckless indifference to the Lytles' rights.
 
 
 38
 Further, a failure to train can only form a basis for liability if "it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations." Canton, 489 U.S. at 397, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). In this case, the City Manager was unaware of any constitutional violations committed against protestors by the police department. And the three incidents that the Lytles point to do not constitute a pattern of unconstitutional conduct of which the City's final policymakers should have been aware. See Carter, 164 F.3d at 220. We can thus find no action or omission on the part of the Norfolk Police Department that would lead to municipal liability.
 
 IV.
 
 39
 For the foregoing reasons, the judgment of the district court is
 
 
 40
 
 AFFIRMED.
 
 
 
 
 Notes:
 
 
 [1]
 Brewer was dismissed by order of the district court on December 22, 1999. He is no longer a party to this case. At that time, the district court allowed the plaintiffs to amend their complaint to include a claim against the City of Norfolk
 
 
 [2]
 The Commissioner argues that this court must defer to any limiting construction of Virginia Code § 46.2-930 given to it by a state court or enforcement agencyGrayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The Attorney General's construction of this statute as merely creating a traffic infraction rather than a criminal offense, however, cannot prevail. This case was brought because authorities used the statute to threaten and effect custodial arrests. And no other interpretation of the statute has been advanced by the Commonwealth that would plausibly solve the vagueness problems that arise from applying the statute to the activities herein.