**Delorise BROWN, Plaintiff,**

v.

**Michelle MITCHELL, et al., Defendants.**

**No. CIV.A. 3:03CV820.**

United States District Court, E.D. Virginia, Richmond Division.

March 9, 2004.

· James B. Thorsen, Esquire, Christopher C. Booberg, Esquire, Craig J. Curwood, Esquire, Thosen & Scher LLP, Richmond, VA, for Plaintiff.

John A. Gibney, Jr., Esquire, Thompson & McMullan, Richmond, VA, for Mitchell.

Elizabeth S. Skilling, Esquire, Harman Claytor Corrigan & Wellman, Glen Allen, VA, for Freund.

Phillip L. Hairston, Esquire, William J. Hoppe, Esquire, Office of the City Attorney, Richmond, VA, for the City.

## MEMORANDUM OPINION

PAYNE, District Judge.

At the time of his death Steven R. Stevenson ("Stevenson") was an inmate who was serving a sentence in the City Jail for the City of Richmond, Virginia (the "Jail") for failing to pay child support. The Plaintiff, Delorise Brown ("Brown"), in her capacity as the administratrix of Stevenson's estate, filed an action in the Circuit Court for the City of Richmond, Virginia against the City of Richmond, Virginia (the "City"), Richmond City Sheriff Michelle Mitchell ("Mitchell"), Chief Physician of the Jail Dr. Jack Freund ("Dr.Freund"), and John Does 1–10, unidentified guards at the Jail, alleging violations of 42 U.S.C. § 1983 and Virginia law.

Pursuant to 28 U.S.C. § 1441, the Defendants removed the action to federal court.[1] All of the Defendants (except for John Does 1–10) have filed motions pursuant to Fed.R.Civ.P. 12(b)(6), alleging that all, or several, of the counts in the Complaint fail to state a claim upon which relief can be granted. In addition, Dr. Freund has moved, under Fed.R.Civ.P. 56(b), for summary judgment respecting the Section 1983 claim against him. For the reasons explained below, these motions are denied in part and granted in part.

## STATEMENT OF FACTS

This statement of facts is based on the Complaint and the documents attached thereto. That, however, is appropriate at this stage because, in reviewing a Rule 12(b)(6) motion, a court must presume all factual allegations in the complaint to be true, see *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir.1999); *Westmoreland v. Brown*, 883 F.Supp. 67, 70 (E.D.Va.1995), and, even when considering a summary judgment motion, a court must accord all favorable inferences from the pleaded facts to the plaintiff where, as here, the filing of the summary judgment motion is not preceded by discovery.

### I. The Circumstances Of Stevenson's Death

Beginning on July 23, 2001, Stevenson was incarcerated in the Jail for failure to pay child support. During the initial intake interview into the Jail, Stevenson, who appeared at that time to be in good health, informed his jailors that he had undergone a splenectomy in 1997 and that, because he lacked a spleen, he had a compromised immune system. In fact, during a previous incarceration in the Jail, Stevenson had been separated from the general population because of the heightened susceptibility to infection and illness that is common in those persons who have no spleen. Nevertheless, for reasons neither explained nor readily apparent, on July 23, 2001, the Jail staff assigned Stevenson to

---

**1.** The Court, therefore, has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over the 42 U.S.C. § 1983 claims and it has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims.

Tier G–3, a general population unit in the Jail. Tier G–3, which contains three toilets and two urinals, was designed to hold 40 inmates; however, during Stevenson's incarceration, approximately 185 inmates were assigned to that tier.

On August 6, 2001, fourteen days after his admission to the Jail, Stevenson began to suffer from severe headaches. Over the next two days, Stevenson complained of these headaches to the on-duty nurse, as well as to several guards. These individuals, however, allegedly took no action, refusing, in fact, even to provide Stevenson with requested headache medicine.

After suffering through two more days of increasingly severe headaches, Stevenson, had become, by August 8, too weak to carry his food tray in the mess hall. A fellow inmate, therefore, needed to assist Stevenson in obtaining and carrying his meal. During the course of this meal, Stevenson vomited and was thereafter excused by guards to return to his cell. Then, during the evening of August 8, a fellow inmate informed two different guards on two separate occasions that Stevenson had no spleen, had a compromised immune system, was quite ill, and consequently required medical attention. The guards, however, took no action.

By August 9, Stevenson had stopped attending meals altogether. Instead, Stevenson remained in his bunk dressed only in his underwear, complaining of chills, inability to eat, and persistent heavy sweating. In fact, Stevenson's only outing from his cell that day was when several inmates helped carry him to the canteen so that he could purchase several personal items. The guards who were stationed on Tier G–3 and at the canteen witnessed this event and thus were aware of Stevenson's inability to walk under his own power.

Later in the day, an inmate informed a guard of Stevenson's increasingly deteriorating condition and requested that Stevenson receive medical attention. The guard, however, declined, suggesting, instead, that Stevenson's cellmates should carry him to the front of the cell so, that if Stevenson lost consciousness, the guards would not need to carry him as far to remove him from the cell. Stevenson's fellow inmates, however, ignored this rather callous request. Instead, the inmates left Stevenson in his bunk and, throughout the night, applied moist towels to his head and fed him snack food from the canteen.

By the next day, August 10, Stevenson was more-or-less unresponsive to exterior stimuli, was sweating profusely, and had begun to vomit a green substance. Stevenson was so debilitated that his fellow inmates had to carry him to the count.[2] Because they recognized Stevenson's symptoms as serious, his fellow inmates repeatedly appealed to the guards for assistance. For most of the day, however, these appeals were ignored. Finally, that afternoon, after many pleas from Stevenson's fellow inmates, the guards allowed Stevenson to see a nurse who, after a brief examination, referred Stevenson for an examination by a doctor.

Later that day, Dr. Freund, the Chief Physician of the Jail, examined Stevenson. Having examined Stevenson's medical charts, Dr. Freund was aware that the patient lacked a spleen. At the time Dr. Freund examined him, Stevenson's temperature was 101 degrees. Recognizing that Stevenson might be suffering from bacterial meningitis, a life threatening condition, Dr. Freund checked Stevenson's neck for rigidity, a circumstance often accompanying bacterial spinal meningitis.

2. The "count" is when every inmate lines up outside of his or her cell so that the guards can count them and ensure that all the inmates are present and in their designated areas.

That test resulted in a negative indication for meningitis; Dr. Freund, however, conducted none of the other tests usually conducted for a person manifesting potential signs of that disease. On that basis, Dr. Freund diagnosed Stevenson's condition as extreme dehydration caused by a viral infection and ordered that he be given a fever reducer and Compazine, a medicine used to treat extreme nausea. He further ordered that Stevenson return to the medical office in four days and that Jail personnel occasionally gauge Stevenson's temperature. Dr. Freund ordered Stevenson returned to Tier G–3 in the interim and did not otherwise place Stevenson under observation.

Stevenson returned to the Jail on the evening of August 10. At some point during that night, Stevenson's fellow inmates were unable to elicit a response from him. The inmates, having had limited success in gaining the guards' attentions through normal channels, began to make loud noises, banging on the bars of the cell and yelling. Finally, a guard responded to these efforts, and, upon seeing Stevenson and hearing the inmates' concerns, instructed the inmates that Stevenson's cell was too hot and that they should attempt to get him out of bed so that he could "get some air." Complaint, at 8 ¶ 41. The guard then left Stevenson and the inmates to their own devices.

Several hours later, the inmates again summoned the guard in order to tell him that their attempts to revive Stevenson had proved fruitless. At this point, the guard summoned the on-duty nurse.

Sometime during the early morning hours of August 11, the nurse arrived at Stevenson's cell and proceeded to slap him about his face, ultimately holding something in front of his nose that caused his body to go into convulsions. When these measures failed to revive Stevenson, the nurse ordered that he be taken to the Virginia Commonwealth University–Medical College of Virginia Hospital (the "VCU–MCV Hospital"). Stevenson arrived at the VCU–MCV Hospital at approximately 2:10 AM that morning, at which point he was completely unresponsive and suffering from acute liver, renal, and cardiac failure as the result of overwhelming sepsis. Less than two days later, Stevenson died in his bed at the VCU–MCV Hospital. The coroner determined the cause of death to be bacterial meningitis.

## II. Background Respecting The Richmond City Jail

The Complaint alleges that, at the time of Stevenson's death, the Jail was overcrowded, poorly ventilated, and unsanitary and that these conditions caused, or contributed to cause, his death. It is necessary, therefore, to consider what the Complaint and the documents attached to it say about the Jail itself and its history.

Built in 1964, the Jail is designed to house 629 inmates. It is the largest local correctional facility in Virginia, and has a larger inmate population than all but one state prison in Virginia. At the time of Stevenson's death, the Jail was operating at more than double its design capacity, averaging a population of over 1,500 inmates per day. Complaint, at 10 ¶ 49. Indeed, Brown alleges that overpopulation at the Jail has been a persistent problem for several decades.

In support of her contentions, Brown submits multiple letters to and from various city officials, including a 1975 letter from then-Richmond City Sheriff Andrew Winston ("Winston") to former City Manager William Leidinger in which Winston complains of dangerous overcrowding and sanitation problems at the Jail. Brown also points to a 1987 letter from Winston to

former City Manager Robert Bobb reiterating these problems.

Brown notes that finally, in 1988, Winston filed in the Circuit Court for the City of Richmond a Bill of Complaint against Edward W. Murray ("Murray"), who was then the Director of the Department of Corrections for the Commonwealth of Virginia. The City, as well as the State Board of Corrections for the Commonwealth of Virginia (the "Board of Corrections"), were also added as defendants to that case.[3] The Bill of Complaint alleged, *inter alia*, that the unsanitary and overcrowded conditions in the Jail represented a danger to the health of the inmates. Ultimately, in a letter opinion dated January 31, 1989, Circuit Court Judge James Wilkinson set forth a full set of findings of facts and conclusions of law. Judge Wilkinson concluded that the maximum number of inmates that could be safely housed at the Jail was 700 and that the Jail, at that time (1989), was grossly overcrowded. Thereafter, Winston agreed to terminate the suit upon securing the City's commitment to build a new facility in which to house female inmates, as well as Murray's promise to remove from the Jail on a timely basis state prisoners being housed there temporarily. Judge Wilkinson dismissed the suit by entering a consent order on March 9, 1989.

Brown, however, alleges that the 1989 litigation did not result in any long-term improvements at the Jail. Indeed, Brown's Complaint also points to more recent litigation surrounding the Jail. On September 10, 2001, less than one month after Stevenson's death, Mitchell, in her capacity as Sheriff, filed a Petition for Writ of Mandamus in the Circuit Court for the City of Richmond.[4] In her Petition, Mitchell states that the Jail is in ill repair and is simply inadequate to meet the needs of Richmond. In addition to alleging that the Jail is too small for its current population, is in general disrepair, and is otherwise outdated, Mitchell's Petition alleges that the Jail suffers from poor heating and cooling systems and lacks an adequate number of showers and toilets. The Petition also recounts Mitchell's contention that the Jail lacks adequate medical facilities. More to the point, the Petition alleges that the Jail presents an unacceptably high risk of contagious disease spreading throughout the inmate population. Finally, the Petition contends that, although Mitchell, over time, repeatedly has brought these concerns to the attention of the City and its administrators, they consistently have failed to take any corrective action. Mitchell's Petition is currently pending in the state court.[5]

### III. The Brown Complaint And The Defendants' Responses

Brown's Complaint proceeds on a number of theories against a number of defendants. It contains eight counts:

---

3. That case, which proceeded in the Circuit Court for the City of Richmond, Virginia, Manchester Division, was styled *Winston v. Murray*, Civ. No. A–3398–C.

4. *See generally* Va.Code Ann. § 53.1–71 ("When it shall appear to the circuit court of any ... city that ... the jail of such ... city is insecure, out of repair or otherwise inadequate, it shall be the duty of such court to award a rule in the name of the Commonwealth against the governing body of the ...

city to show cause why a writ of mandamus should not issue commanding the governing body to ... cause the ... jail of such ... city to be made secure, put in good repair, or rendered otherwise adequate, as the case may be.").

5. At oral argument, counsel for Mitchell advised that, some two and a half years after filing, Mitchell's suit is still in the discovery stage.

- Count I relies on 42 U.S.C. § 1983, charging that Mitchell and the City, pursuant to an official policy or custom, maintained a crowded, poorly ventilated, and unsanitary jail, which reflected a willful indifference to Stevenson's rights, as secured by the Eighth Amendment to the United States Constitution, to be free from cruel and unusual punishment and that this policy or custom caused, or contributed to cause, Stevenson's death.

- Count II also relies on Section 1983, charging that Mitchell failed to train her staff to respond adequately to inmates' medical problems, thereby demonstrating a willful indifference to Stevenson's Eighth Amendment right to be free from cruel and unusual punishment, and that this failure to train caused, or contributed to cause, Stevenson's death.

- Count III proceeds under Section 1983, charging that John Does 1–10, unidentified guards employed by the Jail, were willfully indifferent to Stevenson's serious medical condition and thereby violated his rights under the Eighth Amendment and that these violations caused, or contributed to cause, Stevenson's death.

- Count IV relies on Section 1983, charging that Dr. Freund was willfully indifferent to Stevenson's serious medical needs in violation of Stevenson's Eighth Amendment rights and that, through his indifference, Dr. Freund caused, or contributed to cause, Stevenson's death.

- Count V alleges a state law wrongful death action against the City and Mitchell, claiming that the grossly negligent policies and practices of those Defendants were the cause of Stevenson's death. *See generally* Va. Code Ann. § 8.01–50 (setting forth wrongful death statute).

- Count VI alleges a state-law wrongful death action against John Does 1–10 claiming that their negligent breach of duty caused Stevenson's death.

- Finally, both Count VII and VIII allege state law actions against Dr. Freund, alleging wrongful death (Va. Code Ann. § 8.01–50) and medical malpractice (Va.Code Ann. § 8.01–581.1 *et seq.*), respectively.

The City has moved under Fed.R.Civ.P. 12(b)(6) to dismiss Count I and Count V for failure to state claims on which relief can be granted. Mitchell has also moved, pursuant to Rule 12(b)(6), to dismiss Counts I, II, and V. Dr. Freud has moved for dismissal of Count IV under both Rule 12(b)(6) and Fed.R.Civ.P. 56; he makes no motions, however, with respect to the state law claims.[6]

## DISCUSSION

The law applicable to Brown's claims varies somewhat as to each defendant. Moreover, the various defendants have alleged somewhat different positions in their motions. It is best, therefore, to address the motions of each defendant separately.

### I. The Standard Of Review For The Motions To Dismiss

On a motion to dismiss under Rule 12(b)(6), the allegations of a complaint are to be liberally construed in favor of the plaintiff. *Conley v. Gibson,* 355 U.S. 41, 44, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Chapin v. Knight–Ridder, Inc.,* 993 F.2d 1087, 1092 (4th Cir.1993). A court should only grant a Rule 12(b)(6) motion where it appears beyond a doubt that the plaintiff can prove no set of facts in support of the claim which would entitle her to relief.

---

6. John Does 1–10, being unidentified, have, of course, filed no motions.

*Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir.2001); *DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir.1999). The court must presume all "factual allegations in the complaint to be true and accord[ ] all reasonable inferences to the non-moving party." *Westmoreland v. Brown*, 883 F.Supp. 67, 70 (E.D.Va.1995). The court, however, is not bound to accept as true "conclusory allegations regarding the legal effect of the facts alleged." *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir.1995). Indeed, the "presence ... of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support a finding of [liability]." *Young v. City of Mt. Ranier*, 238 F.3d 567, 577 (4th Cir.2001). Were this not the case, "Rule 12(b)(6) would serve no function, for its purpose is to provide a defendant with a mechanism for testing the legal sufficiency of the complaint." *District 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1086 (4th Cir.1979). These precepts and standards guide the resolution of the motions to dismiss filed by the City, Mitchell, and Dr. Freund.

## II. The City Of Richmond

Count I against the City is a Section 1983 claim alleging an Eighth Amendment violation. Count V is a state law wrongful death claim.

### a. Count V: The Wrongful Death Claim Against The City

 Count V alleges a wrongful death claim against the City pursuant to Virginia Code section 8.01–50, Virginia's wrongful death statute.[7] Under the doctrine of sov-

ereign immunity as interpreted and applied by the Virginia courts, however, a city is immune from state-tort law liability for negligence in the exercise of its governmental, as opposed to proprietary, functions. *Bialk v. City of Hampton,* 242 Va. 56, 405 S.E.2d 619, 620 (1991); *Taylor v. City of Charlottesville*, 240 Va. 367, 397 S.E.2d 832, 834 (1990). The Supreme Court of Virginia has held that the maintenance of a jail is a purely governmental function. *Hoggard v. City of Richmond*, 172 Va. 145, 200 S.E. 610, 611 (1939); *Franklin v. Richlands*, 161 Va. 156, 170 S.E. 718, 721 (1933). Thus, because Count V purports to assert a state law tort claim against the City for maintenance of the Jail, the doctrine of sovereign immunity precludes the Plaintiff from obtaining any relief against the City, even assuming that all of the facts alleged in the Complaint are true. Thus, the City's Rule 12(b)(6) motion to dismiss Count V will be granted.

### b. The Section 1983 Claim Against The City

 The resolution of the City's motion on Count I is slightly more complicated. The Ku Klux Klan Act of 1871, the federal civil rights statute at issue, states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall

---

7. The Court has jurisdiction over the claims sounding in Virginia law pursuant to the supplemental jurisdiction statute, 28 U.S.C. § 1367(a). In exercising supplemental jurisdiction over state law claims, a federal court must apply the applicable state's substantive law. *See Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1416 n. 7 (4th Cir.1992). Thus, the Court will apply the substantive law of Virginia, including the law of sovereign immunity as interpreted by the Supreme Court of Virginia, to those counts alleging state law violations.

be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983; *see generally Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Section 1983, therefore, "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Westmoreland,* 883 F.Supp. at 71 (internal citations and quotations omitted). Hence, to establish liability under Section 1983, a plaintiff must show that the defendant, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury. *Coppage v. Mann,* 906 F.Supp. 1025, 1035 (E.D.Va.1995). The gravamen of Count I is that the City subjected Stevenson to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment. *See generally Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

 Even a cursory examination of the Complaint illustrates that Brown has articulated a legally sufficient Section 1983 Eighth Amendment claim against the guards at the Jail.[8] However, even though cities are "person[s]" amenable to suit under Section 1983, municipal liability may not be predicated upon a theory of vicarious liability or respondeat superior. *Monell v. Dep't of Soc. Serv. of City of N.Y.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, *Monell* establishes that municipal liability under Section 1983 arises only where the munici-

pality, *qua municipality,* has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights. *Id.; see also City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 482–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Spell v. McDaniel,* 824 F.2d 1380, 1385 (4th Cir.1987). Thus, the fact that the guards violated Stevenson's rights, standing alone, is insufficient to establish an Eighth Amendment claim against the City. Instead, Brown must plead and prove that: (1) the City had a policy or custom of deliberate indifference to the deprivation of constitutional rights; and (2) this policy or custom caused the complained of injury. *Westmoreland,* 883 F.Supp. at 76 (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).[9]

The Complaint seeks to satisfy the "official policy or custom" requirement of *Monell* by alleging that the City acted pursuant to an official policy or custom of maintaining the overcrowded, unsanitary, and poorly ventilated conditions at the Jail. Complaint, at 14 ¶ 74. Although it is perhaps conceptually awkward to argue that the City had an official policy or custom of maintaining a Jail in the alleged state, it is fair to read the Complaint as, at least, alleging known and deliberate inaction on behalf of the City. The plausibility of this reading is important because official inaction may, in certain circum-

---

8. *See infra,* note 25 and accompanying text.

9. Through Section 1983, Congress basically created a federal tort action for the deprivation of constitutional and statutory rights. *Randall v. Prince George's County,* 302 F.3d 188, 208 (4th Cir.2002). Because a Section 1983 suit is akin to a tort action, there can be

no claim unless the defendant had a *duty* to the plaintiff respecting the alleged deprivation. It is undisputed, however, that the City does have a duty, imposed by statute, to build and maintain a suitable and safe jail facility. *See* Va.Code Ann. § 15.2–1638. *Cf.* Va.Code Ann. § 53.1–71.

stances, qualify as an official policy or custom for purposes of *Monell.* *See Milligan v. City of Newport News,* 743 F.2d 227, 229–31 (4th Cir.1984). For example, in *Milligan,* the United States Court of Appeals for the Fourth Circuit explained that:

> [A] policy or custom may ... be *inferred from continued inaction* in the face of a known history of widespread constitutional deprivations ... or, in quite narrow circumstances, from [continued inaction in the face of] ... a general, known course of ... conduct [having the "manifest propensity"] to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state.

*Milligan,* 743 F.2d at 229–30 (emphasis added). Thus, *Milligan* sets forth two ways in which municipal inaction may constitute a custom or policy for purposes of *Monell:* (1) when the city fails to act despite a known pattern of constitutional deprivations; or (2) when the city fails to remedy a situation that, unaddressed, is patently likely to cause constitutional deprivations to an identifiable group of persons who stand in a special relationship to the city.

█ All official inaction, however, does not constitute a custom or policy for purposes of *Monell.* And, an official policy or custom may not be inferred merely from an allegation that the municipality failed to act when faced with an isolated or unique constitutional deprivation. In other words, "municipal liability may not be rested simply upon a failure to adopt policies that in retrospect can be seen to be a means by which [a] particular [constitutional deprivation] ... might have been averted." *Milligan,* 743 F.2d at 230.

The Complaint does not allege that any inmate, other than Stevenson, has become sick because of the Jail's overcrowded, unsanitary, and poorly ventilated condition.

For that reason, the City argues that the Complaint fails to allege an official custom or policy under *Monell.* Instead, says the City, the Complaint alleges, at best, that an isolated incident of meningitis occurred at the Jail.

█ That argument ignores the settled rule that housing inmates in a grossly overcrowded and unsanitary facility violates the inmates' rights to be free from cruel and unusual punishments. *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Strickler v. Waters,* 989 F.2d 1375 (4th Cir.1993). Thus, even though the Complaint does not allege that other inmates have gotten sick as a result of conditions at the Jail, it does allege that the City has remained inactive "in the face of a known history" of a constitutional violation. *Milligan,* 743 F.2d at 229–30. As recounted in the statement of facts, the Complaint alleges that, for more than ten years, the City has remained willfully indifferent to the long-known problems, and consequences, of overcrowding, poor ventilation, and unsanitary conditions at the facility. Framed in this fashion, the Complaint satisfies the first method outlined in *Milligan* whereby municipal inaction will constitute an official custom or policy for purposes of *Monell* because it alleges that the City displayed continued inaction in the face of a known history of widespread constitutional deprivations. *Milligan,* 743 F.2d at 229–30.

█ The Complaint also states a cognizable claim against the City under the second route outlined in *Milligan.* That is because the housing of inmates in a grossly overcrowded, poorly ventilated, and unsanitary jail facility such as is described in the Complaint is so likely to result in inmate sickness and suffering that there is an obvious likelihood of constitutional deprivations to an identifiable group of persons having a special relationship to the

municipality. And, that likelihood of deprivation to those persons is so apparent and obvious that, under *Milligan,* municipal inaction, even standing alone and without a pattern of actual sickness or disease transmissions, can constitute a cognizable "official policy or custom" for purposes of *Monell. Milligan,* 743 F.2d at 230.

■ Stevenson, as an inmate housed in the City's Jail, certainly stands in a special relationship with the City. *Cf. Estelle,* 429 U.S. at 103, 97 S.Ct. 285 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."). In addition, an overcrowded, poorly ventilated, and unsanitary jail facility has "the manifest propensity" to spread disease. *Milligan,* 743 F.2d at 230. In fact, Mitchell informed the City of precisely that risk.[10] *See* Complaint, at 11 ¶ 56. Thus, because of the obvious likelihood of injury to an identifiable group of persons who stand in a special relationship to the City, the Complaint fairly characterizes the City's inaction as an official policy or custom for purposes of *Monell,* as applied in *Milligan.*[11]

■ Pleading an official policy or custom, however, is not the only requirement of a legally sufficient Section 1983 complaint. In addition to the policy or custom requirement of *Monell,* a plaintiff seeking to establish municipal liability also must plead that the municipality's custom or policy actually caused the constitutional deprivation. *Monell,* 436 U.S. at 658, 98 S.Ct. 2018; *Gordon v. Kidd,* 971 F.2d 1087, 1097 (4th Cir.1992); *Milligan,* 743 F.2d at 230; *Westmoreland,* 883 F.Supp. at 76.

The Complaint alleges that the overcrowded, unsanitary, and poorly ventilated conditions at the Jail prior to and at the time of Stevenson's death *"caused or contributed"* to his death. Complaint, at 14 ¶ 73 (emphasis added). Therefore, as a technical matter of pleading, the Complaint satisfies the causal requirement of *Monell.* Nonetheless, merely pleading the magic words of causation is insufficient to pass a complaint through the Rule 12(b)(6) crucible because the court need not accept as true "conclusory allegations regarding the legal effect of the facts alleged." *Labram,* 43 F.3d at 921. For that reason, in *Westmoreland,* the court dismissed a Section 1983 suit pursuant to a Rule 12(b)(6) motion, notwithstanding that the plaintiff talismanically had alleged a causal nexus between the municipality's official policy and the complained of injury. *Westmoreland,* 883 F.Supp. at 77. The City maintains that the same result should obtain here.

**10.** The City says that Mitchell's Petition for Writ of Mandamus conveyed no notice on this point because it was filed after Stevenson's death. It is true that Mitchell's suit was filed on September 10, 2001, almost a month after Stevenson's death, but, in her Petition, Mitchell recites that previously she had informed the City of the many problems of which she complains in the Petition. Complaint, at 11 ¶¶ 56, 57. It is reasonable to infer that at least some of these communications occurred before Stevenson's death. And, at the Rule 12(b)(6) stage, Brown is entitled to that favorable inference.

**11.** The City also argues that, because the Board of Corrections, an entity with the pow-

er to determine whether the City is meeting minimum standards at the Jail and to bring a lawsuit against the City to correct any perceived problems, has not brought such an action against the City, the City must not have shown deliberate indifference to the Jail's conditions. The Board of Corrections, however, is not the only entity that can determine whether or not the City's actions and inactions pass constitutional muster. Indeed, through Section 1983, Congress created a vehicle for plaintiffs to bring such grievances before the federal courts. At bottom, what the Board of Corrections may or may not think of the City's actions or inactions is simply not dispositive of a Section 1983 suit.

In *Westmoreland*, the plaintiff, who had been attacked by another inmate, alleged that overcrowding at the jail caused this injury. The court, however, found that the risk to the plaintiff's safety allegedly presented by overcrowding at the jail and the actual injury he suffered were too attenuated to state properly a cognizable claim as framed by the complaint in that case. That case, however, involved a jail guard who actually had arranged for an inmate to attack the plaintiff inmate. Presented with those facts, the court found that, notwithstanding the plaintiff's "conclusory legal assertions" of causation, there was nothing to indicate that overcrowding at the jail had anything to do with the plaintiff's injury. *Westmoreland*, 883 F.Supp. at 77.

■ Brown's allegations, however, are quite different than those in *Westmoreland*. According Brown all reasonable inferences, the Complaint alleges a sufficient causal link between the overcrowded, unsanitary, and poorly ventilated conditions at the Jail and Stevenson's sickness and death. Unlike an arranged fight, which is just as likely to occur in an overcrowded facility as in a reasonably populated one, common sense suggests that bacterial infections are much more likely to occur in an overcrowded, poorly ventilated, and unsanitary jail than in one not suffering from those problems.[12] Thus, unlike *Westmoreland*, this is not a case where the plaintiff can prove no set of facts in support of the alleged causal nexus.[13]

■ For the foregoing reasons, the City's motion to dismiss Count I is denied.[14]

## III. Sheriff Mitchell

The Complaint sets forth three counts against Mitchell, two under Section 1983 and one under state law. Mitchell has moved for dismissal of all three counts

---

12. The City also cites authority in support of *its* contention that Brown must show an actual affirmative causal link between the City's policy or custom and Stevenson's death. *E.g.*, *Carter v. Morris*, 164 F.3d 215, 221 (4th Cir. 1999) (upholding district court's *summary judgment* dismissal of Section 1983 claim where plaintiff failed to offer evidence to support "affirmative causal link" between alleged custom or policy and injury); *Spell*, 824 F.2d at 1388 (reviewing jury verdict of liability in Section 1983 case, noting that mere proof that municipality's custom or policy "was 'likely' to cause a particular violation is not sufficient; there must be proven at least an 'affirmative link' between policy or custom and violation"). These decisions, however, do not speak to what a plaintiff must plead. Rather, they pertain to what a plaintiff must offer in the way of proof in order to survive summary judgment or to prevail at trial. Thus, at the Rule 12(b)(6) stage, these cases are inapposite because a Rule 12(b)(6) motion should only be granted where it appears beyond a doubt that the plaintiff can prove no set of facts in support of the allegations. *Trulock*, 275 F.3d at 405.

13. The City further contends that, even assuming that it had an official policy or custom that was a cause in fact of Stevenson's death, the actions of the Jail guards, Mitchell, and Dr. Freund constitute superceding causes that negate the imposition of liability on the City. The Plaintiff, on the other hand, contends that the City's official custom or policy was a concurrent cause of Stevenson's death and, therefore, that the City is liable despite the fault of the other defendants. The issue of superceding versus concurrent causes, however, is a quintessential question of fact, *see Cohen v. Boxberger*, 544 F.2d 701, 704 (4th Cir.1976), unamenable to resolution at the Rule 12(b)(6) stage.

14. Although Count I properly states a claim against the City, it does seek to recover punitive damages from the municipality. Municipalities, however, are not liable for punitive damages in a Section 1983 action. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Thus, to the extent that Count I seeks punitive damages against the City, it is legally insufficient. Hence, no claim for punitive damages can proceed against the City.

under Fed.R.Civ.P. 12(b)(6), alleging that they fail to state claims upon which relief may be granted.

### a. Counts V And I

■ Count V is a state-law wrongful death claim against Mitchell under Virginia Code section 8.01–50. It alleges that Mitchell was grossly negligent[15] in maintaining the overcrowded, poorly ventilated, and unsanitary conditions at the Jail and that this gross negligence caused Stevenson's death. Complaint, at 22 ¶ 114.[16] Count I, proceeding under Section 1983, alleges that: (1) at the time of Stevenson's death, Mitchell had an official policy or custom of maintaining the Jail in an overcrowded, unsanitary, and poorly ventilated condition; (2) this official policy or custom illustrates that Mitchell acted with willful indifference to Stevenson's Eighth Amendment rights; and (3) this custom or policy caused, or contributed to cause, Stevenson's death.[17]

Mitchell's reason for seeking dismissal of both Count I and Count V is that she cannot be held responsible for the conditions of the Jail. As Mitchell reads the Complaint, both counts are grounded in alleged "structural problems" and the related issue of "overcrowding" at the Jail. Mem. in Supp. of Mitchell's Mot. to Dismiss, at 2. Neither of those problems, says Mitchell, are matters within her control. Relying on "Dillon's Rule," Mitchell contends that, because she has no statutory duty or ability to rectify the complained of structural problems at the Jail, she cannot have been deliberately indifferent or grossly negligent respecting those problems.[18]

The first task in assessing the efficacy of Mitchell's motion to dismiss Counts I and V is to analyze the Complaint itself and determine whether it comports with Mitchell's proposed reading. That analysis discloses that Mitchell's characterization of the Complaint is only partially correct.

---

**15.** The Supreme Court of Virginia has defined gross negligence as a "degree of negligence" which shows "such indifference to others" as to "constitute[] an utter disregard of prudence amounting to the complete neglect of the safety" of another. *Ferguson v. Ferguson,* 212 Va. 86, 181 S.E.2d 648, 653 (1971). It must be such a degree of negligence as would shock fair minded people, although it need not constitute willful recklessness. *Koffman v. Garnett,* 265 Va. 12, 574 S.E.2d 258, 260 (2003).

**16.** The Constitution of Virginia establishes that sheriffs are constitutional officers, who serve independent of the municipal or county governments in which they work. Va. Const. art. VII, § 4; *see also Narrows Grocery Co. v. Bailey,* 161 Va. 278, 170 S.E. 730, 732 (1933). Hence, as a high-level public employee, Mitchell enjoys a qualified immunity from state-law based tort actions. *See Glasco v. Ballard,* 249 Va. 61, 452 S.E.2d 854, 856 (1995). As suggested, however, by the term "qualified immunity," Mitchell's protection from suit is not absolute; rather, she is insulated from liability for *simple* negligence.

*Colby v. Boyden,* 241 Va. 125, 400 S.E.2d 184, 186 (1991). If, therefore, Mitchell's actions amounted to "gross negligence," she is not immune. *Ballard,* 452 S.E.2d at 856.

**17.** Count I and Count II, the Section 1983 claims pending against the Sheriff, proceed against Mitchell in her individual, as opposed to official, capacity. Thus, in considering these counts, it is unnecessary to address whether Mitchell is entitled to immunity from Section 1983 suits seeking retroactive relief from her in her official capacity. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Hussein v. Miller,* 232 F.Supp.2d 653, 659–60 (E.D.Va.2002); *Blankenship v. Warren County,* 918 F.Supp. 970, 974–75 (W.D.Va.1996), *modified,* 931 F.Supp. 447 (W.D.Va.1996).

**18.** Hence, although Count I sounds in federal law and Count V sounds in state law and, therefore, ordinarily would implicate quite different bodies of law, because of Mitchell's identical defensive theory as to Counts I and V, the counts will be considered together in the ensuing analysis.

Although Counts I and V do allege several "structural" problems, structural problems are not the only, or even the principal, import of Brown's allegations.

As Mitchell says, both Counts I and V allege that, at the time of Stevenson's death, the Jail was unsanitary, overcrowded, and poorly ventilated and that those conditions caused, or contributed to cause, Stevenson's death. Ventilation is a structural issue, at least as presented in the Complaint. In other words, because the Complaint takes issue with the manner in which the ventilation system at the Jail is designed and built, as opposed to how the ventilation system is cleaned and maintained, Mitchell is correct to posit that Counts I and V allege structural ventilation problems.

Mitchell also contends that "overcrowding," as employed by Counts I and V, is solely a structural problem. Overcrowding, however, cannot be so narrowly circumscribed because it involves both the Jail's physical capacity to house prisoners, *i.e.*, the ratio of cells to prisoners, which is certainly a structural matter, as well as the admission of prisoners, *i.e.*, population control, which is not at all a structural matter, but rather a matter of administration and management.

Similarly, Mitchell's argument that the Complaint uses the term "unsanitary conditions" in relation to structural problems largely misses the mark. The plain meaning of the word "sanitary" is "of or relating to health: occupied with measures or equipment for improving conditions that influence health: free from or effective in preventing or checking an agent (as filth or infection) injurious to health." *Websters' Third New International Dictionary*, 2012 (1986). Given a reasonable construction, that is the manner in which Counts I and V employ the word. Moreover, the references to unsanitary conditions in the Complaint, contrary to Mitch-

ell's assertions, are not, either actually or implicitly, modified by the term "structural." Although the Complaint points out that at the time of Stevenson's death, there were too few toilet facilities in that part of the Jail where Stevenson was confined (a "structural" problem), the Complaint chiefly alleges that the toilets were unsanitary, *i.e.*, filthy and covered with germs. In fact, Mitchell's own Petition for Writ of Mandamus to the Circuit Court for the City of Richmond, which is incorporated by reference into Brown's Complaint, avers that the plumbing in the Jail often does not work correctly, permitting the inference that, when that happens, the facility is unclean. Indeed, Sheriff Winston's Bill of Complaint, which also is incorporated by reference in the Complaint, alleges that "[t]he toilet facilities in [the Jail] are constantly dirty, fowl [sic] and disgusting. Human excrement is often constantly filling the toilets and even the showers on occasion." Winston's Bill of Complaint also alleges that inmates often wash underwear, socks, and shirts in the same sinks that they use for personal and dental hygienic cleaning. Mitchell herself has alleged that she informed the City authorities of such unsanitary conditions before she filed her Petition. Considering Mitchell's own allegations and those in Sheriff Winston's petition in 1988, it is reasonable to infer that the unsanitary conditions antedated, and were known by Mitchell, before Stevenson's death. Thus, given the plain meaning of the text of Counts I and V and considering the allegations incorporated therein, it is not reasonable to confine the Complaint's several references to "unsanitary conditions" to structural matters.

Having accorded the Complaint the construction to which it is entitled, it is now necessary to consider Mitchell's argument that the conditions complained of (an overcrowded, improperly ventilated, and un-

sanitary jail) are not within her authority to correct and that, therefore, she is absolved of responsibility for those conditions as a matter of law. The assessment of that argument involves a review of the Sheriff's powers and responsibilities, as well as a review of the provisions of Virginia law that allocate responsibility for local correctional facilities, of which the Jail is one.

■ First, Mitchell premises her argument respecting her inability to correct the complained of problems on the doctrine known as "Dillon's Rule." That venerable rule, named after former Supreme Court of Iowa justice John F. Dillon, states that municipal governments and other local governing bodies have only those powers which are expressly granted to them by the state legislature and those powers fairly or necessarily implied from these expressly granted powers. *City of Va. Beach v. Hay*, 258 Va. 217, 518 S.E.2d 314, 316 (1999); *Virginia v. County Bd. of Arlington County*, 217 Va. 558, 232 S.E.2d 30, 40–41 (1977); *see generally* Lawrence M. Friedman, *A History of American Law* 530 (1985); Andrew E. Schultz, *Comment, Dillon's Rule: The Case for Reform*, 68 Va. L.Rev. 693 (1982).

■ Dillon's Rule, however, although strictly followed in Virginia, *see County Bd. of Arlington County*, 232 S.E.2d at 41, is inapplicable to Mitchell because she is not a local governing entity, but rather a constitutional officer whose office is created by the Virginia Constitution. *See* Va. Const. art. VII, § 4. Indeed, as a constitutional officer, a Virginia sheriff is separate and distinct from the municipal or local government in which she may operate. Va. Const. art. VII, § 4; *see also Keathley v. Vitale*, 866 F.Supp. 272, 275 (E.D.Va.1994); *Narrows Grocery Co. v. Bailey*, 161 Va. 278, 170 S.E. 730, 732–33 (1933). Dillon's Rule, which only applies to local governing bodies, therefore, is sim-

ply inapplicable to Mitchell. It certainly provides no basis for Mitchell's assertion that, as a matter of law, she is not responsible for the condition of the Jail.

Nonetheless, there are limits to Mitchell's duties, powers, and obligations because the duties, powers, and obligations of Virginia's constitutional officers are regulated and defined solely by statute. *See Hilton v. Amburgey*, 198 Va. 727, 96 S.E.2d 151, 152 (1957). Article VII, § 4 of the Virginia Constitution states: "The duties and compensation of such officers shall be prescribed by general law or special act." *See also Vitale*, 866 F.Supp. at 275; *Bailey*, 170 S.E. at 732–33. Thus, the urged result, but not the rationale, of Mitchell's argument respecting the limitations on her powers and duties is correct.

The question then becomes what are Mitchell's statutory powers, obligations, and duties respecting the Jail. To begin, it appears that the design, the construction, and apparently the structural maintenance of local jails in Virginia are the responsibilities of local governments—in this case, the City. *See* Va.Code Ann. § 15.2–1638; *May v. Newhart*, 822 F.Supp. 1233, 1235 (E.D.Va.1993). In other words, those responsibilities are not statutorily allocated to the sheriff. By statute, however, the sheriff is "the *keeper* of the local jail, and the *legal custodian* of those who are lawfully confined in it." *Watts v. Commonwealth*, 99 Va. 872, 39 S.E. 706, 707 (1901) (emphasis added); *see also* Va.Code Ann. § 53.1–116 *et seq.* As explained quite fully in *May v. Newhart*, 822 F.Supp. 1233 (E.D.Va.1993), although the locality is responsible for constructing an adequate jail and funding jail operations, "the responsibility for *day to day operations* of the jail falls to the sheriff." *May*, 822 F.Supp. at 1235 (emphasis added). Thus, "the final policymaking decision maker in the [daily]

operation of the jail" is the sheriff. *Id.* at 1236.[19]

■ Applying these principles of Virginia law, Mitchell cannot be held liable under Count I or Count V for the condition of the ventilation system unless the asserted problems implicate matters of "day to day operation" of the Jail. *May,* 822 F.Supp. at 1235. Examples of such daily operations would include the routine maintenance and cleaning of the ventilation system. As discussed above, however, the Complaint does not allege problems with the Jail's ventilation system that are traceable to a lack of "day to day" maintenance and cleaning. Rather, Counts I and V allege that the system is ill designed and not built to heat and cool the volume of inmates housed at the Jail. Counts I and V, as pleaded, therefore, do not state proper claims against Mitchell respecting the alleged ventilation problems because she has no power, duty, or obligation to remedy such problems.

The same result obtains to the extent that, by the term, "unsanitary conditions," the Complaint seeks to reach the structure and design of the Jail itself (*i.e.,* the number of toilets or the design of the bathrooms). To the extent, however, that the term "unsanitary" addresses conditions brought about by the failure to perform adequate maintenance or cleaning, Mitchell can be held liable because such acts are within the reach of "day to day operations" for which she is statutorily responsible. *May,* 822 F.Supp. at 1235 (discussing Va. Code Ann. § 53.1–116 *et seq.*). Thus, because, as delineated more fulsomely above, Counts I and V allege problems readily fixable by routine cleaning and maintenance, *e.g.,* feces on the Jail's floors and filth in its bathrooms, it asserts problems

for which Mitchell is responsible. Therefore, because she had the statutory ability and obligation to remedy the complained of unsanitary conditions, Mitchell's argument that she cannot have been deliberately indifferent or grossly negligent as to such problems is untenable.

Likewise, Mitchell's argument respecting "overcrowding" is largely mistaken. The allegations in the Complaint respecting "overcrowding" bespeak deliberate indifference and gross negligence respecting the known consequences of overcrowding. Indeed, the Complaint alleges overcrowding to an extreme degree. The design capacity of the Jail is alleged to be 629 prisoners. As recounted in the statement of facts, a state court judge in 1989 found, as a matter of fact, that the Jail's maximum capacity was 700 prisoners. The Complaint alleges that, when Stevenson died, the population was approximately 1500 prisoners per day and had been so for a considerable time. *See* Complaint, at 10 ¶ 49. It also alleges that the tier in which Stevenson was housed was designed for 40 prisoners but, at the time of his death, was housing 186 inmates, more than four times its design capacity. *See* Complaint, at 4 ¶ 19.

From these facts, it is permissible to infer that Mitchell deliberately accepted additional prisoners even though she knew that the Jail population was at two and a half times the design capacity. Moreover, the Complaint asserts that Mitchell did so, notwithstanding that she knew that the overcrowding "present[ed] a risk of contagious disease spreading throughout the inmate population," and had so informed the City. Complaint, at 11 ¶ 53.

---

**19.** It is worth noting that even though a Virginia sheriff is a state employee, in the sheriff's operation of a local jail, "the [locality] may be liable for [the sheriff's] policies where they violate constitutional standards." *May,* 822 F.Supp. at 1236; *see also Dotson v. Chester,* 937 F.2d 920, 926 (4th Cir.1991).

In response to Brown's allegations of overcrowding, Mitchell again seeks refuge in Dillon's Rule and Virginia's statutory scheme involving local correctional facilities, arguing that she has no statutory control or authority over the number of inmates housed in the facility.[20] The principal support for her argument is a Virginia statute which provides that:

> The sheriff ... shall receive into the jail *all persons* committed by the order of the [local] courts, or under process issuing therefrom, and *all persons* committed by other lawful authority.

Va.Code Ann. § 53.1–119 (emphasis added). Considering the requirements of the statute and the fact that a Virginia sheriff has no authority to construct or modify local jail facilities, Mitchell argues that, because she is required to accept "all persons" committed to the Jail, she cannot have been deliberately indifferent or grossly negligent as to the alleged overcrowding conditions at the Jail.

It is true that, by statute, the locality, not the sheriff, is required to build and maintain a jail of a reasonable size to house the inmate population. *See* Va.Code Ann. § 15.2–1638. *Cf.* Va.Code Ann. § 53.1–71. A Virginia sheriff, by contrast, has no duty or ability to build, expand, or otherwise improve the structural facilities of a jail. As discussed above, as a constitutional officer, Mitchell's duties and responsibilities are created solely by statute. *See* Va. Const. art. VII, § 4; *Bailey,* 170 S.E. at 732–33. Her statutory duties include maintaining records on all prisoners, formulating and enforcing jail rules, providing security in the jail, and keeping inmates clothed and fed. *See* Va.Code Ann. § 53.1–116 *et seq.; see also Watts,* 39 S.E. at 707. There is no statute, however, requiring or allowing a sheriff to build, add to, or otherwise improve the physical

structure of a jail. Thus, Mitchell is correct respecting her inability to remedy the problem of overcrowding by building a new jail or modifying the existing one. Her failure, therefore, to build a new jail or remedy the existing one cannot be considered gross negligence or deliberate indifference.

However, Mitchell's argument that, as a matter of law, she is exonerated from either a state-law wrongful death action or an action under Section 1983 by virtue of Va.Code Ann. § 53.1–116 *et seq.* is misplaced because the argument simply ignores the remainder of the statutory scheme of which Va.Code Ann. § 53.1–116 *et seq.* is a part. Title 53 is Virginia's statutory scheme for establishing prisons and other correctional facilities. Chapter 3 of Title 53, of which § 53.1–116 *et seq.* is a part, addresses "Local Correctional Facilities." Under § 53.1–74, which also is a part of Chapter 3 of Title 53: "When a ... city is without an adequate jail ... the circuit court thereof shall adopt as its jail, the jail of another county or city until it can obtain an adequate jail." The ensuing sections of Chapter 3 provide for the procedures that are to be followed after such an adoption and set forth mechanisms for providing payment to the adopted jurisdiction. Thus, the General Assembly has provided a means for eliminating overcrowding when overcrowding would render a jail inadequate other than the structural remedies of constructing a new jail facility or expanding an existing one. And, although the authority for arranging for the use of other facilities lies in the local circuit courts, *see* Va.Code Ann. § 53.1–74, Chapter 3 requires the sheriff to know, and keep records reflecting, the population of the local jail. *See* Va.Code Ann. § 53.1–122. Indeed, the sheriff must report there-

**20.** As explained above, Dillon's Rule does not apply to Mitchell, but Article VII, § 4 of the Virginia Constitution provides her with a similar result.

on to the Compensation Board and, if asked, to the local circuit court. *See* Va. Code Ann. §§ 53.1–121–124.

Thus, when a Virginia sheriff knows that a local jail is so overcrowded as to render it inadequate, that sheriff is not, contrary to Mitchell's arguments, without recourse or ability to remedy the overcrowding because, under Virginia's statutory scheme, alternate arrangements can be made by informing the local circuit court of the fact of overcrowding. Indeed, the Virginia legislature provides, quite clearly, that when so informed, the circuit court "*shall adopt as its jail, the jail of another county or city until it can obtain an adequate jail.*" Va. Code Ann. § 53.1–74 (emphasis added).[21] Additionally, under another section of the statute, the circuit court can, upon Petition for Writ of Mandamus, command a governing body to put its own jail in good repair and be made otherwise adequate. Va. Code Ann. § 53.1–71.

■ Mitchell, whose job includes the operation of the Jail in accord with the dictates of Title 53, is charged with knowledge of these statutes. And, she is charged with knowledge of conditions in the Jail over which she has charge. Her failure to use these statutory mechanisms in the face of known overcrowding to the extent of the inadequacy as alleged in the Complaint certainly can be considered "deliberate indifference" within the meaning of Eighth Amendment jurisprudence or gross negligence under Virginia's wrongful death jurisprudence.

For the foregoing reasons, Mitchell's motion to dismiss Counts I and V on the theory that she has no responsibility for conditions at the Jail that are alleged to have caused Stevenson's death will be denied in part and granted in part. As to both Counts I and V, the motion to dismiss is granted to the extent that both counts allege defects in the design, construction, and structural maintenance of the Jail. The motion to dismiss is otherwise denied.[22]

**b. Count II**

■ Count II also alleges a claim under 42 U.S.C. § 1983 against Mitchell.[23] Count II, however, proceeds under a failure to train theory. *See generally City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("We hold today that the inadequacy of ... training may serve as the basis for [42 U.S.C.] § 1983 liability ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the [subordinates] ... come into contact."). To impose liability on a supervisor for the failure to train subordinates, a plaintiff must plead and prove that: (1) the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) the supervisor failed to train properly the subordinates thus illustrating a "deliberate indifference" to the rights of the persons with whom the subordinates come into contact; and (3) this failure to train actually caused the subordinates to violate the plaintiff's rights. *Harris*, 489 U.S. at 388–92, 109 S.Ct. 1197; *see also Doe v. Broderick*, 225 F.3d 440, 456 (4th

---

**21.** It is arguable that § 53.1–74 applies only when a local jail is being repaired or newly constructed, but the statute does not textually limit its application to such circumstances. And, even if it were limited thusly, the Sheriff can resort to § 53.1–71, as indeed Mitchell's predecessor did in 1988 and Mitchell herself did less than a month after Stevenson's death.

**22.** Whether, under the decision in *May v. Newhart*, 822 F.Supp. 1233 (E.D.Va.1993), the potential liability under Count I is that of the Sheriff or the City must await further factual development.

**23.** Count II also is directed toward Sheriff Mitchell in her individual, rather than official, capacity. *See supra*, note 17.

Cir.2000); *Carter v. Morris,* 164 F.3d 215, 221 (4th Cir.1999); Anthony D. Schroeder, *Note, The Deliberate Indifference Standard in 42 U.S.C. § 1983 Municipal Liability Failure to Train Cases,* 22 U. Tol. L.Rev. 107, 126 (1990).[24]

### (1) Actual Violation Of Rights By Subordinates

To satisfy the first element of a failure to train claim, the Complaint must allege that Mitchell's subordinates actually violated Stevenson's rights. *Young v. City of Mt. Ranier,* 238 F.3d 567, 579 (4th Cir.2001) ("The law is quite clear ... that a section 1983 failure to train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee."). In conformance with this precept, the Complaint alleges that John Does 1–10 (who are unidentified guards employed by the Jail) violated Stevenson's Eighth Amendment right to be free from cruel and unusual punishment. An Eighth Amendment claim of this sort requires a showing that the guards were "deliberately indifferent to a serious medical need." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Specifically, the plaintiff asserting this type of Eighth Amendment claim must show that: (1) objectively the medical need was serious; and (2) subjectively the guards acted with a sufficiently culpable state of mind, that is, they failed to act in the face of a subjectively known risk. *Johnson v. Quinones,* 145 F.3d 164, 167 (4th Cir.1998)

(citing, *inter alia, Estelle,* 429 U.S. at 104, 97 S.Ct. 285).

Brown alleges that Stevenson was suffering from bacterial meningitis, an objectively serious medical situation, and that the guards knew, *inter alia,* that: (1) Stevenson lacked a spleen and thus had a compromised immune system; (2) was vomiting a green substance; (3) was sweating profusely; and (4) was at various times unresponsive and unable to walk under his own power and that, therefore, the guards subjectively recognized that Stevenson was seriously ill. The guards, however, took no action on his behalf. The Complaint, therefore, concludes that the inaction of the guards constituted "willful disregard" to a subjectively known serious medical condition in violation of Stevenson's constitutional rights. Complaint, at 17 ¶ 90.[25] These allegations state a proper Eighth Amendment claim. And, by properly pleading a Section 1983 claim against Mitchell's subordinates, Brown has satisfactorily alleged the first element of a failure to train claim under *Harris.*

### (2) Deliberate Indifference

Of course, the assertion of a properly stated claim against the guards is insufficient to impose failure to train liability on Mitchell. *Harris,* 489 U.S. at 389, 109 S.Ct. 1197. The imposition of supervisory liability on a failure to train theory is merely a more specific formulation of the *Monell* "official policy or custom" inquiry wherein the official "policy or custom" is the training program (or lack thereof). *Cf.*

---

24. In her memorandum in support of the Rule 12(b)(6) motion, Mitchell asserts an additional element: that the plaintiff must show that the supervisor knew of a pattern of constitutional or statutory deprivations and yet took no action to train her subordinates to stem this pattern of deprivations. This, however, is merely one way (albeit some cases seem to suggest the only way) to establish

deliberate indifference; it is not, contrary to Mitchell's paper, a separate element of a Section 1983 failure to train case.

25. Although the Complaint does not use the preferred term "deliberate indifference," the words "willful disregard" convey a sufficiently similar meaning.

*Spell v. McDaniel,* 824 F.2d 1380, 1389–90 (4th Cir.1987). In other words, because *Monell* does not allow for liability under a respondeat superior theory, but requires that the supervisory power itself did, or failed to do, something, a proper failure to train complaint must satisfy the custom and practice requirement. And, after *Harris,* the requisite standard that a plaintiff must allege is that of "deliberate indifference." *Harris,* 489 U.S. at 388, 109 S.Ct. 1197 ("[O]nly where a [supervisor's] failure to train its employees ... evidences a 'deliberate indifference' to the rights of [people with whom the employees will come into contact] can such a shortcoming be properly thought of as a ... 'policy or custom' that is actionable under [42 U.S.C.] § 1983.").

■■■ A principal, indeed perhaps the main, thrust of *Harris,* the decision in which the Supreme Court of the United States first applied the "deliberate indifference" standard to a failure to train claim, is that a supervisory power cannot be liable, under Section 1983, for the actions of its subordinates unless it is on fair *notice* that subordinates are engaged in constitutional or statutory deprivations. In other words, in order to have exhibited deliberate indifference, the supervisory power must have had notice of the constitutional or statutory violation, and thereafter must have consciously chosen a particular course of action in response.[26] *Harris,* 489 U.S. at 389, 109 S.Ct. 1197 ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such failure under [42 U.S.C.] § 1983."). Because that is an element of a cognizable claim of this sort, the notice must be articulated in the complaint, or be fairly inferable from what is articulated.

It is generally acknowledged that, if the supervisory power is actually aware of the fact that its subordinates are regularly violating constitutional or statutory rights, and the supervisory power fails to implement a training program to quell this pattern, deliberate indifference exists. *E.g., Harris,* 489 U.S. at 397, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part); *Lytle v. Doyle,* 326 F.3d 463, 474 (4th Cir.2003); *Jordan v. Jackson,* 15 F.3d 333, 341 (4th Cir.1994); *Brubaker v. City of Richmond,* 943 F.2d 1363, 1380 (4th Cir.1991); *Pachaly v. City of Lynchburg,* 897 F.2d 723, 726 (4th Cir.1990). Thus, for instance, if a police chief knows that his officers are regularly violating suspects' Fourth Amendment rights, and he fails to implement a training program addressing searches and seizures, he is acting with deliberate indifference to the rights of suspects.

Relying on the decision in *Lytle v. Doyle,* 326 F.3d 463 (4th Cir.2003), Mitchell contends that, because Brown "does not suggest, and cannot suggest, that situations similar to Stevenson's were widespread or constituted a pattern," Count II fails to state a cognizable failure to train claim. Mem. in Supp. of Mitchell's Mot. to Dismiss, at 5. In *Lytle,* the court stated that a failure to train "can *only* form a basis for [supervisor] liability if it can be shown that policymakers were aware of, and acquiesced in, *a pattern of constitutional violations* [on the part of their subordinates]." *Lytle,* 326 F.3d at 474 (emphasis added). Thus, extrapolating from *Lytle,* Mitchell posits that, because Brown has not alleged that there was a pattern of deliberate indifference exhibited by Jail guards to meningitis or other serious illness, the failure to train claim is improper.

Mitchell cannot be faulted for making this argument because it is based on the

---

**26.** The chosen course of action may, of course, be inaction.

correctly cited text of *Lytle.* The principal problem with Mitchell's argument is that the cited text in *Lytle,* as interpreted by Mitchell, is at odds with that part of *Harris* where the majority explained that:

> [I]t may happen that in light of the duties assigned to specific ... employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... [by failing to implement new or better training] can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible and for which the city may be liable if it actually causes injury.

*Harris,* 489 U.S. at 390, 109 S.Ct. 1197. Indeed, the text of *Lytle* on which Mitchell relies also contradicts other Fourth Circuit precedent which rather clearly holds that a supervisory power may be liable under a failure to train theory when it fails "adequately to prohibit or discourage *readily foreseeable conduct* in light of known exigencies of [the particular employment]," *Spell,* 824 F.2d at 1390 (emphasis added), or when it fails to institute a training program the need for which was *"plainly obvious"* due to the nature of the subordinates' work. *Broderick,* 225 F.3d at 456 (emphasis added).

██ The controlling rule, of course, is supplied by the majority decision in *Harris;* and, under *Harris,* the absence of an allegation of a pattern is not necessarily fatal to a failure to train claim. That, however, is not to say that *Harris* does not permit a claim based on allegations of a pattern of constitutional violations. Indeed, *Harris* clearly allows a failure to train claim where deliberate indifference is alleged to have occurred in the form of a pattern of constitutional violations (thereby satisfying the custom or policy require-

ments of *Monell* as explicated by *Harris* ). But, as a majority of justices in *Harris* held, a failure to train claim also can be based on a supervisory power's failure to train its employees concerning an obvious constitutional duty that the particular employees are certain to face. *Harris,* 489 U.S. at 390, 109 S.Ct. 1197. Thus, when a failure to train claim posits the deprivation of a clear constitutional right that is implicated in recurrent situations, the presence of a pattern is not an element of the claim.

The point is well-illustrated in Justice O'Connor's separate opinion in *Harris,* which explains that a plaintiff can establish that a supervisory power was on notice of the need to train in one of two general ways. Most obviously, supervisory liability for failure to train is "proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations [by subordinates]." *Harris,* 489 U.S. at 397, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). That is because, by failing to act in the face of repeated constitutional deprivations, the then on-notice supervisory power makes a deliberate or conscious choice, thereby creating a "custom or policy" for purposes of *Monell.*

Like the majority, however, Justice O'Connor also recognized that supervisory liability may attach when the supervisory power fails to train "employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Harris,* 489 U.S. at 396, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). As the majority opinion and Justice O'Connor's separate opinion make clear, this alternate theory of failure to train liability, of course, is only available in situations where the underlying constitutional right is quite clear and is one that the subor-

dinates reasonably can be expected to confront with some regularity. However, because of the clear and recurrent nature of certain rights, the supervisory power is on fair notice that a failure to train respecting such rights will result in deprivation even in situations where no pattern of deprivation has yet to develop. *Id.* ("The constitutional duty of the individual [employee] is clear, and it is equally clear that failure to [train the employee respecting] that duty will create an extremely high risk that constitutional violations will ensue.") (O'Connor, J., concurring in part and dissenting in part).[27] In other words, if the supervisory power fails to train subordinates who will almost certainly encounter situations implicating the constitutional right, it is fair to state that the supervisory power has made a "deliberate or conscious choice." *Harris,* 489 U.S. at 389, 109 S.Ct. 1197. Consequently, the imposition of supervisory liability in such a situation does not offend *Monell.*

The text of *Lytle,* on which Mitchell's argument chiefly relies, is based on a citation to that portion of Justice O'Connor's opinion in *Harris* which discusses those category of failure to train cases that base notice and, hence, custom or policy, on a supervisory power's failure to act in the face of the presence of a pattern of constitutional violations. On that point, Justice O'Connor said: "Second [after discussing the other alternative involving clear, recurrent constitutional rights] I think municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations." *Harris,* 489 U.S. at 397, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dis-

senting in part). Justice O'Connor, however, did not say that this was the *only* form that a failure to train claim could take. For that reason and considering that the majority in *Harris* explicitly recognized the alternative form of failure to train cases involving clear and recurrent rights, *Harris,* not *Lytle,* controls.

Furthermore, when *Lytle* is put in context, it is not inconsistent with *Harris,* or, for that matter, the Fourth Circuit opinions of *Doe v. Broderick,* 225 F.3d 440 (4th Cir.2000), and *Spell v. McDaniel,* 824 F.2d 1380 (4th Cir.1987). An examination of the district court opinion in *Lytle* shows that the failure to train claim in that case was based on the alleged presence of a pattern of constitutional deprivations, not on the alternative mode of satisfying the deliberate indifference standard sanctioned by the *Harris* majority and made explicit by Justice O'Connor's separate *Harris* opinion. *See Lytle v. Doyle,* 197 F.Supp.2d 481, 495–97 (E.D.Va.2001). Further, the focus of the failure to train claim in *Lytle,* in both the district court and on appeal, was whether city officials were aware of the alleged pattern of constitutional deprivations. Viewed in that context, the cited text from *Lytle* is best understood not as defining a singular form for failure to train claims, which would put *Lytle* at odds with *Harris,* but, instead, as articulating the unremarkable proposition that only if there is awareness of the pattern is there a cognizable pattern-mode claim (which, of course, would put *Lytle* in harmony with *Harris,* as well as *Doe v. Broderick,* 225 F.3d 440 (4th Cir.2000), and

---

**27.** As an example of this category, Justice O'Connor cited the Fourth Amendment prohibition against the unreasonable use of deadly force. *See generally Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Justice O'Connor stated that the constitution-

al duty of police officers with respect to deadly force is quite clear and it is a recurrent situation that almost every police officer will face. *Harris,* 489 U.S. at 396, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part).

*Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987)).

At bottom, as Justice O'Connor's separate opinion in *Harris* makes clear, there are, in fact, two categories of failure to train cases, one involving a pattern of constitutional deprivations and one involving singular deprivations of more obvious rights. And, due to the fair notice requirements of *Monell*, each category proceeds somewhat differently as respects what must be pleaded and proved to establish deliberate indifference. Mitchell, who contends that the Complaint fails to state a claim because it fails to allege a pattern of constitutional deprivations at the Jail, is really asking the Court to place this action in the second Justice O'Connor category, *i.e.*, the category at-issue in *Lytle*. If, however, the Complaint concerns "a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face," *Harris*, 489 U.S. at 396, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part), it does not need to allege a pattern of constitutional deprivation to state a legally cognizable claim. *See also Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("In [*Harris*], we did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger [supervisory] liability.").

█ Count II resonates in that category of failure to train cases involving singular violations of clear and recurrent rights rather than in the pattern-mode category of failure to train cases. The Complaint alleges that Mitchell had a duty to ensure that her subordinates were adequately trained to recognize and adequately respond to serious medical conditions presented by inmates under their charge. The constitutional requirements imposed by the Eighth Amendment on the individual employee guards is clear: they must not be deliberately indifferent to a serious medical situation. Moreover, that Eighth Amendment duty is implicated in recurrent situations because, during his or her tenure, every Jail guard is almost certain to be in charge of inmates with serious medical conditions. Thus, as a case implicating a clear and recurrent constitutional right, Brown's Complaint is a cognizable failure to train claim under *Harris*.

The Complaint's lack of an allegation respecting a pattern of constitutional deprivations, therefore, contrary to Mitchell's argument, is not fatal. Construed liberally in favor of the plaintiff, *see Conley*, 355 U.S. at 44, 78 S.Ct. 99, the Complaint alleges that Mitchell was deliberately indifferent by failing to institute a proper training program respecting the clear and recurrent Eighth Amendment right of inmates to have their serious medical needs attended to. Thus, Count II fairly alleges that Mitchell acted with deliberate indifference, hence satisfying the second element of a Section 1983 failure to train claim.

### (3) Causation

█ Finally, to survive the Rule 12(b)(6) motion, a plaintiff proceeding under a failure to train theory must allege a causal nexus between the failure to train and the complained of injury. *Harris*, 489 U.S. at 391, 109 S.Ct. 1197. Brown's Complaint alleges that the Jail guards' inadequate training led them to watch Stevenson suffer through an obviously serious medical condition and intentionally decline to provide sufficient medical attention and that the deliberate failure to act caused, or contributed to cause, Stevenson's death. Complaint, at 15 ¶ 79. Thus, the Com-

plaint clearly alleges that Mitchell's failure to train was a cause in fact of Stevenson's death. Moreover, notwithstanding Mitchell's contentions that Brown will be unable to establish an affirmative causal link between any failure to train and Stevenson's injury, the Court should only grant a Rule 12(b)(6) motion where it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim. *Conley*, 355 U.S. at 45, 78 S.Ct. 99. When the alleged facts are construed in Brown's favor and she is accorded the benefit of all reasonable inferences, it is not improbable that Brown will be able to establish that Mitchell's failure to train her subordinates caused Stevenson's death. Indeed, it is not a far reach to conclude that a reasonably trained guard would not have ignored a man in Stevenson's highly debilitated condition until it was too late to save him. *Compare with Westmoreland*, 883 F.Supp. at 77 (dismissing Section 1983 complaint on Rule 12(b)(6) motion because plaintiff could prove no facts in support of alleged causal connection). Thus, Count II is sufficient to satisfy the final element of a Section 1983 failure to train case.

For the foregoing reasons, Count II alleges a proper Section 1983 failure to train claim against Mitchell. Hence, her motion to dismiss Count II will be denied.

## IV. Dr. Freund

There are three claims against Dr. Freund: (1) Count IV alleges an Eighth Amendment violation by way of Section 1983; (2) Count VII alleges a wrongful death claim under Virginia law; and (3) Count VIII alleges a medical malpractice

claim under Virginia law. Dr. Freund has only moved for dismissal of Count IV, the Section 1983 claim against him, under both Fed.R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 56. As unfortunately has become the vogue of late, Freund has moved alternatively to dismiss for failure to state a claim and for summary judgment without adequately addressing the significantly different standards applicable to, and without making the distinctly different analyses called for by, these two significantly different motions. Nevertheless, because Dr. Freund's Rule 12(b)(6) motion is well-taken, there is no need to discuss his summary judgment motion or to discuss the appropriate standard for review of such a motion.[28]

In Count IV, Brown alleges that Dr. Freund violated Stevenson's Eighth Amendment right to be free from cruel and unusual punishment. In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that a medical professional violates the Eighth Amendment when he shows "deliberate indifference" to a prisoner's "serious" medical needs. *Estelle*, 429 U.S. at 104, 97 S.Ct. 285; *see generally* James J. Park, *The Constitutional Tort Action as Individual Remedy*, 38 Harv. C.R.-C.L. L.Rev. 393, 428–30 (2003). Thus, a plaintiff alleging an Eighth Amendment violation against a medical professional must plead: (1) the denial of a medical need that objectively is so serious as to implicate the ban against cruel and unusual punishment; (2) that the doctor[29] acted with a sufficiently culpable state of mind—that is, he deliberately did not act in the face of a

---

28. The standards for assessing Rule 12(b)(6) motions were outlined above. They will not be repeated here.

29. The medical professional must, of course, act "under color of law" in order for Section

1983 liability to attach. *See West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). It is undisputed, however, that Dr. Freund acted under color of law for purposes of this suit.

subjectively known risk; and (3) the doctor's conduct caused the injury or consequence of which the plaintiff complains. *Johnson v. Quinones,* 145 F.3d 164, 167 (4th Cir.1998); *Rish v. Johnson,* 131 F.3d 1092, 1096 (4th Cir.1997).[30]

Count IV clearly alleges an objectively serious medical need when, in paragraph 91, it incorporates paragraphs 1–90 by reference. Indeed, the Complaint articulates at least two objectively serious medical conditions: bacterial meningitis and severe dehydration. It, however, does not plead that Dr. Freund possessed a subjectively known risk as to either ailment. Indeed, as to bacterial meningitis, the Complaint pleads that Dr. Freund tested for it (albeit in a cursory fashion) and concluded that Stevenson did not have the condition. Furthermore, there is nothing in the Complaint that articulates that Dr. Freund had a subjective knowledge of the serious risk presented by the severe dehydration that he diagnosed in Stevenson.

■ The Complaint, therefore, is legally insufficient in its effort to posit a cognizable section 1983 claim for violation of the Eighth Amendment. The affidavit and brief offered in opposition to Dr. Freund's motion for dismissal, however, indicate that, upon careful study of the applicable law and thoughtful analysis of the facts, the Plaintiff may be able to satisfy the requirements for presenting a cognizable section 1983 claim against Dr. Freund. Count IV, therefore, will be dismissed without prejudice and with leave to file an amended complaint with a new Count IV which Dr. Freund shall then answer.

Having granted the motion to dismiss Count IV under Fed.R.Civ.P. 12(b)(6), there is no need to assess Dr. Freund's summary judgment motion. Hence, it will be denied without prejudice.[31]

30. Older Fourth Circuit authority was that "deliberate indifference" could be established by a showing that a prison official disregarded a substantial risk of danger that was either actually known by the defendant *"or which would [have been] apparent to a reasonable person in the defendant's position." Miltier v. Beorn,* 896 F.2d 848, 851–52 (4th Cir.1990) (emphasis added). In other words, if a plaintiff could show that a reasonable person in the prison official's position should have realized that the known facts were indicative of the existence of a serious medical risk, the plaintiff would satisfy the second part of the *Estelle* formulation despite the defendant's lack of actual knowledge. In 1994, however, the Supreme Court held that the *Estelle* "deliberate indifference" Eighth Amendment standard requires a showing that the defendant *actually realized* that the prisoner faced a substantial risk of serious harm. *Farmer v. Brennan,* 511 U.S. 825, 840, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, *Farmer* overruled cases, such as *Miltier,* to the extent that they allowed a finding of deliberate indifference upon constructive knowledge. The *Farmer* Court, however, noted that, if a plaintiff could establish that a prison official had been exposed to information of such a nature that he "must have known" about the risk, then such evidence could be sufficient to permit a trier of fact to find that the defendant had actual knowledge of the risk. *Farmer,* 511 U.S. at 842–43, 114 S.Ct. 1970; *see also Coppage,* 906 F.Supp. at 1039 ("[S]ubjective knowledge may be proved by circumstantial evidence ... [thus] 'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.' ") (quoting *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970).

31. Dr. Freund has raised, in a rather cursory fashion, an argument for qualified immunity as part of his summary judgment motion. Considering that Count IV, the only count to which that assertion is made, is being dismissed and that the summary judgment motion is being dismissed without prejudice, it is unnecessary to address Dr. Freund's qualified immunity argument. Nonetheless, defense counsel is admonished to review carefully the law of qualified immunity before again raising the issue and, if thereafter, it is nonetheless thought to be available, to address it fully and in the proper analytical framework.

## CONCLUSION

For the reasons stated above, the Defendants' motions are granted in part and denied in part. Specifically, the Motion to Dismiss filed by Mitchell is granted to the extent that Counts I and V allege defects in the design, construction, and structural maintenance of the Jail. The Motion is otherwise denied. The Motion to Dismiss and Motion for Summary Judgment filed by Dr. Freund is granted, and Count IV will be dismissed without prejudice. That portion of Dr. Freund's Motion seeking summary judgment will be denied as moot. The Motion to Dismiss filed by the City is denied as to Count I except to the extent that Count I seeks punitive damages, but the Motion is granted as to Count V.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.